UNITED STATES of America,
Plaintiff,

v.

MATUSOFF RENTAL COMPANY,
et al., Defendants.

No. 3:99cv626.

United States District Court,
S.D. Ohio,
Western Division.

March 30, 2007.

Bill Lann Lee, Dale Ann Goldberg, United States Attorney's Office, Dayton, OH, Donald Walker Tunnage, Isabelle M. Thabault, Joan A. Magagna, US Department of Justice, Housing & Civil Enforcement Section, Patricia Molteni, Department of Justice, Washington, DC, for Plaintiff.

Thomas Patrick Whelley, II, Chernesky Heyman & Kress, Martin A. Beyer, Sebaly Shillito & Dyer, Dayton, OH, for Defendants.

**FINDINGS OF FACT; OPINION; CONCLUSIONS OF LAW; JUDGMENT TO BE ENTERED IN FAVOR OF PLAINTIFF AND AGAINST DEFENDANT ROGER MATUSOFF; TERMINATION ENTRY**

RICE, District Judge.

The Government brought this litigation under the Fair Housing Act ("FHA"), 42

U.S.C. § 3601, *et seq.*, alleging, *inter alia,* that the Defendant Roger Matusoff ("Matusoff") discriminated against prospective tenants at three apartment complexes, located in Xenia, Troy and Sidney, Ohio, on the basis of their race and familial status.[1] The Government seeks to recover monetary damages on behalf of the victims of Matusoff's alleged discrimination, as well as injunctive relief prohibiting him from violating the FHA. The three apartment complexes were titled in the name of Matusoff Rental Company, a sole proprietorship that was owned and operated by Matusoff.[2] Before trial commenced, this Court sustained the Government's Motion for Partial Summary Judgment (Doc. # 83), with which it had requested summary judgment as to liability on its claim that Matusoff had engaged in a pattern or practice of discriminating against applicants for and residents of apartments on the basis of familial status, in violation of 42 U.S.C. § 3604(a). *See* Docs. # 92 (Entry Granting Plaintiff's Motion) and # 91 (Transcript of Court's Oral Decision).

The Government's claim that Matusoff also engaged in a pattern or practice of discriminating against applicants for and residents of apartments on the basis of race and the appropriate remedies for such familial and, if found, racial discrimination were tried over three days, with this Court sitting as finder of facts. Matusoff was not represented by counsel during the trial. Although he participated during the trial's first day, he declined to appear for the second and third days. In accordance with Rule 52 of the Federal Rules of Civil Procedure, this Court now sets forth its Findings of Fact and Conclusions of Law.[3]

## I. Findings of Fact

By way of explanation, the Court will initially set forth its introductory findings of fact, in which the key individuals are identified and context is presented. The Court will then set forth its findings concerning Matusoff's liability for engaging in a pattern or practice of race discrimination in violation of the FHA. Finally, this Court will list its findings of fact pertinent to the remedies for the victims of Matusoff's pat-

1. The Government initially joined Rebecca McCord, Peggy Penwell and Lonnie Penwell as Defendants. Those three were employed by Matusoff. The Government has, however, settled its claims against those Defendants. *See* Doc. # 95.

2. The Government initially named Matusoff Rental Company as a Defendant. Before trial began, Matusoff, who had decided to represent himself, indicated that Matusoff Rental Company is his sole proprietorship. *See* Transcript of January 31, 2002, Proceedings at 17. The Court has accepted Matusoff's statement in that regard, since, if Matusoff Rental Company were a corporation or a partnership, Matusoff could not have represented it, and the Court would have entered a default judgment against that Defendant. Given that Matusoff Rental Company is a sole proprietorship owned and operated by Matusoff, it did not have a legal identity separate from that of its owner, Matusoff. *See Patterson v. V. & M Auto Body*, 63 Ohio St.3d 573,

574–75, 589 N.E.2d 1306, 1308 (1992) (noting that a "sole proprietorship has no legal identity separate from that of the individual who owns it," that "[i]t may do business under a fictitious name if it chooses, but doing business under another name does not create an entity distinct from the person operating the business" and that "[t]he individual who does business as a sole proprietor under one or several names remains one person, personally liable for all his obligations") (internal quotation marks and citation omitted). Therefore, the Court treats Matusoff and his sole proprietorship, Matusoff Rental Company, as one Defendant, i.e., the individual Roger Matusoff.

3. During the first day of the trial, Matusoff's former counsel remained in order to be available as a resource with whom Matusoff could consult concerning trial procedures. Given that Matusoff had decided not to participate during the final two days of the trial, his former counsel was not there to serve as a resource for him on those two days.

terns or practices of discriminating on the basis of familial status and race.

### A. Introduction

1. Throughout the period relevant to this lawsuit, Matusoff operated three apartment complexes, to wit: Villa de Marquis Apartments in Troy, Ohio ("Troy Villa"); Northwood Village Apartments in Sidney, Ohio ("Northwood"); and Villa de Marquis Apartments in Xenia, Ohio ("Xenia Villa"). Those three complexes had one and two bedroom apartments, comprised of buildings or structures each of which is occupied as a residence by one or more families.

2. A resident manager and maintenance man employed by Matusoff lived at each of those three apartment complexes. Typically, those two individuals were a married couple or a couple that was not married but was cohabitating. As part of their compensation, the couple would live rent-free in an apartment in the complex for which they were responsible.

3. Peggy and Lonnie Penwell were, respectively, the resident manager and maintenance man for Troy Villa. They supervised and helped to train the resident managers and maintenance men at Northwood and Xenia Villa.

4. Becky McCord ("McCord") was the employee of Matusoff who had overall supervisory authority over the three apartment complexes and their resident managers and maintenance men, including the Penwells. Matusoff supervised McCord.

5. Matusoff did not provide training to McCord, the Penwells, and/or any of the resident managers and maintenance men concerning the obligations imposed by federal (i.e., the FHA), state and local fair housing laws.

### B. Pattern of Race Discrimination in Violation of the FHA

6. During 1991, Patricia and James Fawcett worked as the resident manager and maintenance man at Xenia Villa. Matusoff made comments to them, while pointing to African–Americans, indicating that he did not want African–American tenants living in that apartment complex. In addition, James Fawcett observed Matusoff apply a different standard to African–American applicants than to Caucasian applicants, resulting in the denial of apartments to African–Americans. Matusoff also required James Fawcett to defer maintenance work on apartments occupied by African–Americans. On one occasion, James Fawcett was instructed not to repair or to replace the stove which had ceased working in the apartment of an African–American tenant, despite the fact that he was instructed to replace broken appliances in the apartments of Caucasian tenants. Matusoff fired Patricia and James Fawcett, because they had assisted African–American rental applicants and performed maintenance in the apartments of African–American tenants.

7. In 1991 and in 1996, Matusoff's agents identified the race of African–American applicants, by marking an "X" on their applications.

8. During 1992 and 1993, Darlene and Stanley Bradburn worked as the resident manager and maintenance man at Xenia Villa. While so employed, Matusoff would occasionally ask them about the number of African–Americans who resided in that apartment complex and express his dissatisfaction if he believed that too many African–Americans tenants were living there.

9. During the spring of 1992, Ronald Leach and his wife were hired as the resident manager and maintenance man at Northwood. After being hired, they were told by Matusoff's office manager that,

although it was illegal to discriminate on the basis of race, "we" would prefer that you not rent to African–Americans. The "we" included Matusoff.

10. During 1997, Rebecca Grimm ("Grimm") and Kenneth Devers ("Devers") served, respectively, as the resident manager and maintenance man for Xenia Villa. McCord told them the put an "X" or "m" on the application of any African–American who sought an apartment at that complex. As an alternative, Grimm and Devers were required to notify McCord verbally about African–American applicants. McCord required Grimm and Devers to indicate on an application whether the applicant was an African–American, because Xenia Villa had more African–American tenants than Troy Villa or Northwood. Matusoff was aware of and approved of McCord's behavior in that regard. Grimm and Devers filed complaints of discrimination about what they experienced while working at Xenia Villa and, as a result, they were discharged.

11. Matusoff's agents maintained rent rolls, on which tenants and their apartment numbers were listed. For instance, during 1997, Matusoff required that African–American tenants be identified by an "m" next to their names on the rent rolls.

12. Lonnie Penwell, during discussions with Matusoff's resident managers and maintenance men whom he supervised, frequently referred to African–Americans in highly racist language. He also used such language in the presence of McCord, who did not indicate that the use of such racist language was inappropriate or re-mind him that it was illegal to discriminate on the basis of race.

13. A number of African–American applicants for apartments and tenants at the apartment complexes owned by Matusoff were discriminated against on the basis of their race. During the early spring of 1997, Marvin Berry was denied an apartment at Xenia Villa, because he is an African–American. At that same time, Antwan and Kenetta Hurd Williams were denied an apartment at Xenia Villa, because they are African–Americans.[4] Tamara Whitfield, then Tamara Davis–Gales, was denied an apartment at Xenia Villa, because she is an African–American.[5] Denise Hatfield and her boyfriend, Edward Henry, were denied an apartment at Xenia Villa because they are African–Americans. Mari Kamara, an African–American, applied for an apartment in the Xenia Villa complex in 1997. Her application was rejected, because of her race. Also, in 1997, Tarija Carr applied for an apartment at Xenia Villa, for herself, her husband Frederick and her daughter Jasmine. Her application was rejected because she is an African–American. Similarly, Angela Bent applied for an apartment at Xenia Villa, for herself and her daughter Tiana Shelby, only to be denied because she is an African–American. In 1989 or 1990, Grace Smith attempted to rent an apartment at the Xenia Villa complex, in order to have a place to stay when she visited her daughter who was a student in Xenia.[6] She was denied the apartment because she is an African–American.

14. Jennifer Fransecky, her daughter Kalia and her boyfriend William Kane

---

4. When they applied the apartment, Kenetta Hurd Williams was the fiancee of Antwan Williams. Her name was then Kenetta Hurd.

5. The Government refers to Whitfield as Wakefield. *See* Doc. # 90 at 15. Since her name is listed as Whitfield in the transcript, this Court has identified her with that name.

6. Grace Smith lived in Louisville, Kentucky.

were permitted to move into Troy Villa on a month to month basis, in anticipation of moving out of state.[7] Jennifer Fransecky is an African–American, and William Kane is a Caucasian. While they lived in that apartment complex, Peggy and Lonnie Penwell refused to perform needed maintenance on their apartment. The Penwells refused to perform the maintenance because of Jennifer Fransecky's race. They also refused to accept a rent check from Jennifer Fransecky, and told her and her family to vacate the premises because of her race.

15. Race discrimination was Matusoff's standard operating procedure, rather than being sporadic, isolated or accidental. Therefore, he engaged in a pattern and practice of discriminating against African–American tenants and applicants for apartments on the basis of their race.

C. *Remedies for the Victims of Discrimination*

16. Patricia and James Fawcett, both of whom are victims of Matusoff's pattern or practice of race discrimination, are each entitled to recover compensatory damages in the sum of $15,000.

17. Rebecca Grimm, a victim of Matusoff's pattern or practice of race discrimination, is entitled to recover compensatory damages in the sum of $20,000. Kenneth Devers, also a victim of that practice, is entitled to recover $7,500, as compensatory damages.

18. Marvin Berry, another victim of Matusoff's pattern or practice of race discrimination, is entitled to recover $15,000, as compensatory damages.

19. Antwan and Kenetta Williams, additional victims of Matusoff's pattern or practice of race discrimination, are each entitled to recover compensatory damages in the sum of $15,000.

20. Tarija Carr, another victim of Matusoff's pattern or practice of discriminating on the basis of race, is entitled to recover $7,500, as compensatory damages.

21. Angela Bent, an additional victim of Matusoff's pattern or practice of race discrimination, is entitled to recover compensatory damages in the sum of $15,000, while her daughter, Tiana Shelby, also such a victim, is entitled to recover $7,500.

22. Denise Hatfield and Edward Henry, two more victims of Matusoff's pattern or practice of race discrimination, are each entitled to recover compensatory damages in the sum of $20,000.

23. Mariama Kamara, who was denied an apartment because she is an African–American, is entitled to recover compensatory damages in the sum of $15,000.

24. Tamara Whitfield, who was denied an apartment because of her race, is entitled to recover compensatory damages in the sum of $20,000.

25. Jennifer Fransecky, also a victim of Matusoff's pattern or practice of race discrimination, is entitled to recover $7,500, as compensatory damages.

26. Donna and Glenn Darnell, along with their son Anthony, were denied an apartment at Troy Villa, because of familial status, becoming victims of Matusoff's pattern or practice of discrimination on the basis of that status. Donna and Glenn Darnell and the estate of Anthony are each entitled to recover compensatory damages in the sum of $20,000.

27. Charles Cotrell and his son Jeremy were denied an apartment at Northwood, because of familial status, becoming addi-

7. The residence which they had occupied sold more quickly than they had anticipated, ne-

cessitating their need to move into an apartment for a short period of time.

tional victims of Matusoff's pattern or practice of discrimination on the basis of such status. Each of them is entitled to recover compensatory damages in the sum of $20,000.

28. Robert and Vickie Harrold, along with her sons Seth and Levi Ratliff, were denied an apartment at Xenia Villa, because of familial status, becoming victims of Matusoff's pattern or practice of discrimination on the basis of such. Vickie Harrold is entitled to recover compensatory damages in the sum of $20,000, while Robert is entitled to $15,000, as compensatory damages.

29. Jeremy and Heather Blanford are victims of Matusoff's pattern or practice of discrimination on the basis of familial status. Each is entitled to recover compensatory damages in the sum of $7,500.

30. Deunna Bledsoe is a victim of Matusoff's pattern or practice of discrimination on the basis of familial status, as a result of not being permitted to move into a one-bed apartment at Xenia Villa after becoming pregnant. She is entitled to recover compensatory damages in the sum of $20,000.

31. Brad Berry became a victim of Matusoff's pattern or practice of discrimination on the basis of familial status, when he was not permitted to remain in a two-bedroom apartment at Troy Villa with his daughter and son. He is entitled to recover compensatory damages in the sum of $20,000.

32. By engaging in patterns or practices of discriminating on the basis of race and familial status discrimination, Matusoff acted with reckless indifference to the requirements of the Fair Housing Act. Indeed, his discriminatory conduct was egregious and outrageous.

33. Each victim of those patterns or practices, to whom the Court has awarded compensatory damages, is awarded an amount of punitive damages in the sum of $5,000. As a consequence, the following individuals are awarded the following amounts of punitive and compensatory damages:

a. Patricia Fawcett $20,000;

b. James Fawcett $20,000;

c. Rebecca Grimm $25,000;

d. Kenneth Devers $12,500;

e. Marvin Berry $20,000;

f. Antwan Williams $20,000;

g. Kenetta Williams $20,000;

h. Tarija Carr $12,500;

i. Angela Bent $20,000;

j. Tiana Shelby $12,500;

k. Denise Hatfield $25,000;

l. Edward Henry $25,000;

m. Mariama Kamara $20,000;

n. Tamara Whitfield $25,000;

o. Jennifer Fransecky $12,500;

p. Donna Darnell $25,000;

q. Glenn Darnell $25,000;

r. Estate of Anthony Darnell $25,000;

s. Charles Cotrell $25,000;

t. Jeremy Cotrell $25,000;

u. Vickie Harrold $25,000;

v. Robert Harrold $20,000;

w. Jeremy Blanford $12,500;

x. Heather Blanford $12,500;

y. Deunna Bledsoe $25,000; and

z. Brad Berry $25,000.

34. In sum, the Court has awarded $405,000 in compensatory damages and $130,000 in punitive damages, making the total award $535,000.

## II. Opinion

As it did with its Findings of Fact, the Court will initially discuss Matusoff's liabil-

ity for engaging in a pattern or practice of race discrimination, following which it will turn to the appropriate remedies, discussing in order the remedies for the victims of his discrimination on the basis of familial status and, if found, on the basis of race. Finally, the Court will set forth its reasons for denying the requested injunctive relief.

### A. Liability for Engaging in a Pattern or Practice of Race Discrimination

■■■ The FHA provides that it is unlawful to refuse to rent any dwelling because of a person's race and to discriminate against any person in the terms, conditions or privileges of rental of a dwelling on the basis of his race. 42 U.S.C. § 3604(a) and (b).[8] In *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), the Supreme Court explained that, in order for the Government to prove the existence of a pattern or practice of discrimination, it must "establish by a preponderance of the evidence that racial discrimination was the [defendant's] standard operating procedure[,] the regular-rather than the unusual practice" and must prove more than "the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts." *Id.* at 336, 97 S.Ct. 1843.[9] Since this lawsuit has been tried, the Court dispenses with considerations of whether the Government established a prima facie case of discrimination and turns to the ultimate question of whether Matusoff discrimi-

nated against tenants and applicants for apartments on the basis of race. *See Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 720 (6th Cir.2004) ("When entertaining a motion for judgment as a matter of law following a trial on the merits in a Title VII case, 'a reviewing court should not focus on the elements of the prima facie case but should assess the ultimate question of discrimination.' ") (quoting *Gray v. Toshiba Am. Consumer Products, Inc.*, 263 F.3d 595, 599 (6th Cir.2001)) (citation omitted). In *Green v. Century 21*, 740 F.2d 460 (6th Cir.1984), the Sixth Circuit noted that "[u]nder federal housing law a principal cannot free himself of liability by delegating a duty not to discriminate to an agent." *Id.* at 465. Accord *Sanders v. Dorris*, 873 F.2d 938, 944 (6th Cir. 1989). Therefore, Matusoff is liable for the actions of his agents such as McCord and the Penwells. The Court now turns to the question of whether the Government proved by the preponderance or greater weight of the evidence that race discrimination was Matusoff's standard operating procedure, rather than sporadic, isolated or accidental.

■■■ Simply stated, the evidence overwhelmingly causes this Court to find that racial discrimination in the operation of the three apartment complexes was Matusoff's standard operating procedure. There is evidence of Matusoff having engaged in such discrimination as early as 1989 or 1990, when Grace Smith was denied an

---

8. Dwelling is defined by the FHA to include "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families." 42 U.S.C. § 3602(b). The Court has found above that the three apartment complexes owned by Matusoff are buildings or structures which are occupied as a residence by one or more families. Therefore, Xenia Villa, Troy Villa and Northwood are "dwellings" under the FHA.

9. Although *International Brotherhood of Teamsters* was a lawsuit under Title VII, the Sixth Circuit has applied the standards applicable to the statute in actions under the FHA. *See e.g., Selden Apartments v. United States Department of Housing and Urban Development*, 785 F.2d 152, 159 (6th Cir.1986).

apartment, because she is an African–American. In 1991, Matusoff indicated to James and Patricia Fawcett, the husband and wife he had employed to manage and provide maintenance at the Xenia Villa apartment complex, that he did not want African–Americans living in that complex. James Fawcett was also directed not to repair or replace the stove of an African–American tenant, because of her race. Matusoff applied different criteria to African–American applicants, resulting in their being denied apartments. During 1992 and 1993, Matusoff and his agents exhibited similar behavior to Darlene and Stanley Bradburn and to Ronald Leach and his wife, other resident managers/maintenance men. In 1997, Rebecca Grimm and Kenneth Devers were directed to inform Becky McCord which applicants for apartments were African–Americans. Moreover, the Court has found eight instances in which African–Americans were denied apartments because of their race.[10] In addition, Jennifer Fransecky and William Kane were denied needed maintenance and were told to vacate their apartment because she is an African–American.[11]

Accordingly, the Court has found that racial discrimination in the renting of apartments was Matusoff's standard oper-ating procedure and that, therefore, he engaged in a pattern or practice of race discrimination.

### B. Remedies for the Victims of Discrimination

In a civil action brought by the Government to enforce the FHA, if a discriminatory housing practice is found to have occurred:

> the court may grant as relief any relief which a court could grant with respect to such discriminatory housing practice in a civil action under section 3613 of this title. Any relief so granted that would accrue to an aggrieved person in a civil action commenced by that aggrieved person under section 3613 of this title shall also accrue to that aggrieved person in a civil action under this subsection.

42 U.S.C. § 3612(*o*)(3). Section 3613(c)(1) provides:

> (1) In a civil action under subsection (a) of this section, if the court finds that a discriminatory housing practice has occurred or is about to occur, the court may award to the plaintiff actual and punitive damages, and … may grant as relief, as the court deems appropriate, any permanent or temporary injunction,

---

**10.** The evidence demonstrated that those applicants were qualified for the apartments they were seeking. Indeed, they were more qualified than some similarly situated Caucasian applicants who were accepted. See *Harper v. Hutton*, 594 F.2d 1091, 1093 (6th Cir. 1979) (holding that the lessor/defendant had violated the FHA because he refused to rent an apartment to African–Americans of limited means, while renting apartments to Caucasians of similarly limited means). Moreover, the Government presented McCord's deposition testimony that many of the applicants were denied apartments because they were African–Americans.

**11.** One could argue that they were told to vacate the premises because Jennifer Fran-secky was more trouble than she was worth, as a month to month tenant, because she was constantly pestering the Penwells about needed repair work. Nevertheless, this Court has found that they were told to vacate the premises because of their race, given that Peggy Penwell used racist language when discussing Jennifer Fransecky's requests for repair work. The Court has found that they were denied repairs on the basis of her race, because Lonnie Penwell, who had displayed racial animus to many individuals, testified that repair work is performed within a day or two. There was no evidence of any reason other than race to explain the failure to provide the needed repairs.

temporary restraining order, or other order (including an order enjoining the defendant from engaging in such practice or ordering such affirmative action as may be appropriate).

Thus, the Government can recover compensatory and punitive damages on behalf of the victims of discrimination. *See Preferred Properties v. Indian River Estates, Inc.,* 276 F.3d 790, 799 (6th Cir.2002) (holding that the "FHA provides that victims of discriminatory housing practices may recover actual and punitive damages"). As a means of analysis, the Court will initially discuss the compensatory damages to which the victims of discrimination are entitled, following which it will turn to punitive damages.

*1. Compensatory Damages*

■ Compensatory damages may be awarded under the FHA for emotional distress, humiliation, embarrassment, mental anguish and out-of-pocket losses caused by a defendant's discriminatory housing practices. *Green,* 740 F.2d at 464; *Ragin v. Harry Macklowe Real Estate Co.,* 6 F.3d 898, 907 (2d Cir.1993). Herein, the Government has requested this Court award compensatory damages in the sum of $20,000, $15,000, or $7,500, to the victims of Matusoff's pattern or practice of race and familial status discrimination. Those who suffered the most severe actual damages would receive $20,000, while those who suffered less severe actual damages would be awarded $15,000, and all other victims would receive $7,500. *See* Doc. # 90 at 38. This Court was initially opposed to awarding damages based upon such a scale; however, upon reflection, it has decided to follow the Government's suggestion. Even though many of the vic-

tims of Matusoff's discriminatory practices suffered out-of-pocket expenses, such as the increased cost of securing housing, moving expenses, lost wages and medical expenses, the difficulty in quantifying and proving such expenses and the additional fact that emotional suffering, which cannot be calculated with mathematical precision, constitutes a major component of the harm experienced by those victims for which compensation has been sought, made the Government's approach both pragmatic, fair and reasonable to all concerned. Therefore, in the absence of any objection from Matusoff concerning the method of awarding compensatory damages requested by the Government or any suggested alternative, this Court will adopt that methodology, a methodology which this Court finds to be conservative, insofar as the amount of damages is concerned. That said, however, this Court will not award compensatory damages to any victim of Matusoff's discriminatory practices, in the absence of evidence that said victim suffered some type of harm as a result, whether that harm be an out-of-pocket loss or emotional suffering. As a means of analysis, the Court will address the victims of Matusoff's pattern or practice of discrimination on the basis of race and familial status in the order presented by the Government in its Proposed Findings of Fact and Conclusions of Law (Doc. # 90).[12]

The Government has suggested that the Court award compensatory damages in the sum of $15,000, each, to Patricia and James Fawcett (*see* Doc. # 90 at 4–5), and this Court agrees. The Fawcetts were fired from their positions as resident manager and maintenance man, because they had assisted African–American rental applicants and had performed maintenance in

---

**12.** Since the Government has not requested that this Court award compensatory damages to Grace Smith, a victim of Matusoff's race

discrimination, this Court does not consider that question.

apartments of African–American tenants. As a result, they lost wages and their residence, incurred expenses to move and to store their furniture, were required to live with his parents, had difficulty finding replacement jobs and experienced great stress and emotional suffering. Thus, this Court has found that Patricia and James Fawcett are each entitled to recover compensatory damages in the sum of $15,000.

The Government argues that the Court should award $20,000, as compensatory damages to Cindy Goodhue, and the same sum of compensatory damages to Michael Goodhue. *See* Doc. # 90 at 5–7. This Court cannot award compensatory damages to either of those individuals, since neither testified during the trial of this litigation. Although the Government read their declarations, the statements in those documents had been made out of court and were offered for their truth. Therefore, those statements are hearsay. *See* Fed. R.Evid. 801(c). Moreover, those statements are not admissible under any exception to the hearsay rule. *See Id.* at 804, 807.

Rebecca Grimm and Kenneth Devers worked as a resident manager and maintenance man at Xenia Villa. They filed charges of discrimination, as a result of Matusoff's discriminatory practices at those complexes and were fired. The Government suggests that the Court award each of them $20,000, as compensatory damages. *See* Doc. # 90 at 7–9. Grimm and Devers were given three days to move out of their apartment after having been fired, which caused them to abandon some of their belongings. Since they were unable to locate a new apartment in which to live together, they lived more than one hour apart from each other, which caused them to cease seeing each other. Grimm had difficulty finding a new job, as a result of telling prospective employers that she had been discharged from her prior employment. She also suffered stress and mental anguish over her prospects for finding a new job, which caused her to seek medical assistance. Therefore, the Court has found above that Grimm is entitled to recover $20,000, as compensatory damages. With respect to Devers, however, there is no evidence that he experienced similar difficulties securing alternative employment or that he suffered the same type of emotional distress. Consequently, this Court has found that he is entitled to recover compensatory damages in the sum of $7,500.

Marvin Berry applied for an apartment at Xenia Villa, only to be denied such housing because he is an African–American. The Government suggests that the Court award him $15,000, as compensatory damages. *See* Doc. # 90 at 9–10. As a result of being discriminated against, Berry was unable to live in the housing of his choice or with his chosen roommate. He also suffered emotional distress. Therefore, this Court has found that he is entitled to recover compensatory damages in the sum of $15,000.

In 1997, Antwan and Kenetta Williams applied for an apartment at Xenia Villa, only to be rejected because they are African–Americans. As a consequence of being discriminated against, Antwan Williams was required to expend an additional $4,000 on living expenses, while Kenetta Williams did not receive a $5,000 refund on student housing. They also suffered emotional distress as a result of being the victims of racial discrimination. Therefore, as requested by the Government (Doc. # 90 at 10), this Court has found that Antwan and Kenetta Williams are each entitled to recover $15,000, as compensatory damages.

Tarija Carr applied for a two-bedroom apartment at Xenia Villa for herself, her

husband, Frederick, and her minor daughter, Jasmine. Tarija Carr testified that the alternative apartment they secured after being rejected at Xenia Villa was less attractive, was not kept up as well and was in a worse location. As a consequence, the Court has found that she is entitled to recover $7,500, as compensatory damages. There is no evidence, however, that her daughter and/or her husband suffered harm as a result of the shortcomings of their alternative housing or for any other reason resulting from Matusoff's discriminatory practices. Therefore, they are not entitled to recover compensatory damages.

Angela Bent and her daughter Tiana Shelby were denied an apartment at Xenia Villa, because they are African–Americans. As a consequence, Bent was required to secure an alternative apartment, the rent for which was an additional $50 per month. In addition, she was required to purchase an air conditioner, because the alternative apartment was not air conditioned. As a consequence of those increased expenses, Bent was unable to provide new clothing to her daughter and had to cut back on outings with her. Bent also suffered stress and mental distress as a result of the pressure that Mutusoff's discriminatory practices put on family finances and as a result of being discriminated against. Shelby was denied the companionship of her mother on family outings, as well as new clothing as a consequence of being the victim of discrimination. Therefore, as recommended by the Government (Doc. # 90 at 12–13), the Court has found that Bent is entitled to recover compensatory damages in the sum of $15,000, and that Shelby is entitled to recover $7,500.

Denise Hatfield, a Caucasian, and Edward Henry, an African–American, were denied an apartment at Xenia Villa because of Henry's race. As a consequence, they had to pay more to rent an apartment in Dayton, far from family and friends in Xenia. Moreover, the alternative apartment proved to be less safe, given that break-ins frequently occurred there. Moreover, after Hatfield became pregnant and had given birth, Hatfield secured the services of a family friend in Xenia, whom she had known her entire life, to babysit. This, in turn, caused her to spend additional time commuting in the morning and in the evening, which would not have been necessary had she lived in Xenia. As a result of being the victims of discrimination and spending less time together, the relationship between Hatfield and Henry suffered great stress for a period of time. Based upon the foregoing, as suggested by the Government (Doc. # 90 at 13–14), the Court has found that Hatfield and Henry are each entitled to recover $20,000, as compensatory damages.

Mariama Kamara was denied an apartment at Xenia Villa because she is an African–American. As a consequence of Matusoff's discriminatory practices, Kamara has experienced serious emotional distress, was denied the opportunity of living in the apartment of her choice and second-guesses whether decisions made against her are based on her race. In addition, it took her longer to commute to and from work, and she was required to pay $65 more in monthly rent. Therefore, as requested by the Government (Doc. # 90 at 14–15), the Court has found that Kamara is entitled to recover $15,000, as compensatory damages.

Tamara Whitfield, then Tamara Davis–Gales, was denied an apartment at Xenia Villa because she is an African–American. As a result, she has become more suspicious of race discrimination in her life, suffered serious emotional distress, had to expend significant time finding alternative apartments, initially moved into a much

less desirable apartment,[13] incurred expenses moving from the first replacement apartment to the second and had to pay a significantly greater monthly rent. Therefore, as suggested by the Government (Doc. # 90 at 15–16), the Court has found that Whitfield is entitled to recover compensatory damages in the sum of $20,000.

Jennifer Fransecky, an African–American, her daughter Kalia and her boyfriend William Kane, who is a Caucasian, moved into an apartment in Troy Villa on a temporary basis, after their house had sold more quickly than anticipated, pending a move to New Jersey. While living there, they were denied needed maintenance on their apartment, which had a serious leak, because of Jennifer Fransecky's race. As a result of the failure to repair the leak, Jennifer Fransecky suffered stress. Therefore, the Court has found that she is entitled to recover $7,500 as compensatory damages. However, neither her daughter Kalia nor William Kane suffered harm as a result of the discriminatory treatment; therefore, they are not entitled to recover compensatory damages.

In 1993, Donna and Glenn Darnell, along with their son Anthony, were not permitted to move into an apartment at Troy Villa because of their familial status. The Darnells lived in motels both before and after seeking to live at Troy Villa. Living in motels meant that they to cook their meals on a hot plate and store perishable food in a common refrigerator. As a consequence of being victims of familial status discrimination, they incurred additional costs to live in the motels and to store their possessions. Because of the limited space in the motels, Anthony Darnell did not have room to have his toys to play with. He was also denied the privacy and freedom that would come from living in an apartment, as opposed to a motel. In addition, as a result of the discrimination, Donna Darnell suffered severe emotional distress. Moreover, given the limited space in a motel, they argued quite a bit. Therefore, the Court has found, as suggested by the Government (Doc. # 90 at 19–20), that Donna Darnell, Glenn Darnell and the estate of Anthony Darnell, who is deceased, are each entitled to recover $20,000, as compensatory damages.

Charles Cottrell was denied an apartment in Northwood, for himself and his minor son Jeremy, because of familial status. As a consequence, they moved into an alternative apartment in a different neighborhood, which did not have parks or other recreational facilities in the area. In contrast, parks, a large vacant field and a YMCA were all located near Northwood. Moreover, the move caused Jeremy to attend a less desirable school. The change of schools led to the destabilization of the relationship between the father and his son. In addition, the rent for the alternative apartment into which they moved was about $30 to $40 more per month. Therefore, as recommended by the Government (Doc. # 90 at 20–21), this Court has found that Charles and Jeremy Cotrell are each entitled to recover $20,000, as compensatory damages.

Robert and Vickie Harrold, along with her two minor sons, Seth and Levi Ratliff, were denied an apartment at Xenia Villa because of familial status. As a consequence of Matusoff's discriminatory practices, they moved into a house, which cost about $140.00 more per month to rent. They also had to purchase air conditioners, because the house lacked air conditioning,

---

**13.** Whitfield vacated the first apartment into which she had moved, because it was infested with roaches.

and equipment to take care of the yard. Moreover, they had to pay more than $30 per month for water, for which they would not have been charged at Xenia Villa. The increased costs incurred to provide housing caused them to experience emotional distress and worry over whether they would be able to provide for Seth and Levi. Vickie Harrold, the mother of those boys, was more distressed than her husband, by being the victim of discrimination and by the concern for being able to provide for her sons. Therefore, as requested by the Government (Doc. # 90 at 21–22), this Court has found that Vickie Harrold is entitled to recover compensatory damages in the sum of $20,000, while Robert Harrold is entitled to recover $15,000. The Court cannot find, however, that Seth and/or Levi Ratliff is entitled to recover compensatory damages, given that there is no evidence that Matusoff's discriminatory practices caused them to suffer harm.

Jeremy and Heather Blanford rented a one-bedroom apartment in Northwood. At the time, they had no children; however, Peggy Penwell told Jeremy Blanford that they would have to move, if Heather became pregnant and gave birth. She subsequently became pregnant. The Blanfords learned of the availability of a house after she had been pregnant for about seven months and moved to that new residence. Given that they would not have moved if they had been permitted to stay in a one-bedroom apartment, they were victims of familial status discrimination, even though they were not evicted or told to move by the management of the apartment complex. They incurred the expense of $50 to rent a truck to move, and paid $100 more per month for electricity at the house into which they moved. In addition, Heather Blanford fell down some steps on the day they moved, although she was not injured and did not seek medical attention. Therefore, the Court has found that Jeremy and Heather Blanford are each entitled to recover $7,500, as compensatory damages.

Deunna Bledsoe was living with a roommate in a two-bedroom apartment in Xenia Villa, when she became pregnant. She attempted to move into a one-bedroom apartment, because her roommate was a smoker and she did not want to expose her child to second hand smoke. Her request was denied, with Lonnie Penwell telling her that the owner did not want any more children living in the complex. Thus, she was a victim of Matusoff's pattern or practice of discriminating on the basis of familial status. As a consequence, Bledsoe had to expend $45 more a month to rent a less desirable apartment. In addition, the alternative apartment did not have carpeting, so she paid to have it installed in order to protect her child. She also was distressed over being discriminated against because she was going to have a child, and experienced anxiety over obtaining the necessary money and assistance to move. Therefore, the Court has found that Bledsoe is entitled to recover compensatory damages in the sum of $15,000.

Brad Berry lived in a two-bedroom apartment In Troy Villa with his daughter, Patricia. After he obtained custody of his son, Joshua, he was ultimately given a three-day notice to vacate the premises, because he was permitted to have only one child in the apartment. Thus, Brad Berry became a victim of Matusoff's pattern or practice of discrimination on the basis of familial status. He incurred expenses to move and suffered stress and anxiety worrying whether he could find a suitable apartment for his family. The rent for the alternative apartment he secured was $30 to $40 more per month. The rooms in the new apartment are a bit smaller and the air conditioning is not as effective. The less effective air conditioning caused Brad

Berry's asthma to become worse in hotter months. Therefore, the Court has found that Brad Berry is entitled to recover $20,000, as compensatory damages. His children, Patricia and Joshua, are not, however, entitled to recover such damages, given that there is no evidence that they suffered harm as a result of being victimized by Matusoff's pattern or practice of discriminating on the basis of familial status.

## 2. Punitive Damages

▄ In *Preferred Properties, supra,* the Sixth Circuit set forth the standards which are applicable to the award of punitive damages:

The standard for punitive damages in a federal civil rights action is based on the defendant's state of mind and does not require egregious or outrageous behavior. *See Smith v. Wade,* 461 U.S. 30, 56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983) (holding that a jury may award punitive damages in a § 1983 action "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others"). In *Kolstad v. American Dental Ass'n,* 527 U.S. 526, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999), a Title VII employment discrimination case, the Supreme Court expressly rejected the argument that a defendant's conduct must be egregious to support a punitive damages award. *Id.* at 535, 119 S.Ct. 2118 ("The terms 'malice' or 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination."). However, the *Kolstad* Court held that "an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable in punitive damages." *Id.* at 536, 119 S.Ct. 2118. Employers who are simply "unaware of the relevant federal prohibition" or believe that the discrimination is lawful are not subject to punitive damages liability. *Id.* at 536–37, 119 S.Ct. 2118.

We have not yet addressed whether the *Kolstad* standard for punitive damages is applicable in the context of the FHA, but two circuits have determined that it is. *Badami v. Flood,* 214 F.3d 994, 997 (8th Cir.2000); *Alexander v. Riga,* 208 F.3d 419, 430–32 (3d Cir.2000), *cert. denied,* 531 U.S. 1069, 121 S.Ct. 757, 148 L.Ed.2d 660 (2001). In *Alexander,* the Third Circuit reversed the district court's denial of the plaintiffs' request to submit the issue of punitive damages to the jury. *Alexander,* 208 F.3d at 435. After the liability and compensatory and/or nominal damages phase of the trial, the jury had returned a special verdict finding that the plaintiffs' rights under the FHA had been violated by the owner and manager of an apartment building who repeatedly refused to deal with African–Americans but just as consistently responded to the inquiries of white individuals. *Id.* at 424–25. Because the jury did not award compensatory damages, the district court declined to send the issue of punitive damages to the jury, on the grounds 1) that the jury apparently did not believe that the defendant was liable under *Smith* and 2) that a punitive damages award required "more than intentional discrimination." *Id.* at 431. Citing *Kolstad,* the *Alexander* court held that the jury's finding of a FHA violation, which "necessarily encompasses a finding of intentional discrimination," meant that the plaintiffs could receive punitive damages without "demonstrat[ing] that the conduct was particularly egregious or malicious." *Id.*

We also conclude that a jury may award punitive damages for violations of the FHA, even if the defendant did not engage in egregious misconduct. Like 42 U.S.C. § 1981 a, which was at issue in *Kolstad*, 42 U.S.C. § 3604 "does not require a showing of egregious or outrageous discrimination independent of the [defendant's] state of mind." *Kolstad*, 527 U.S. at 535, 119 S.Ct. 2118. The FHA prohibits discriminatory housing practices, 42 U.S.C. § 3613(a)(1)(A), against persons with disabilities or those associated with such persons. *Id.* § 3604(f)(1). Relief for discriminatory housing practices requires only that a seller be engaged in unlawful discrimination.

Under *Smith* and *Kolstad*, the question for the availability of punitive damages is whether "the defendants acted with malice or reckless indifference that their actions might violate a federal statute of which they were aware." *Badami*, 214 F.3d at 998. In addition, we have previously indicated that the purpose of a punitive damages award is to deter future wrongdoing as well as to punish wrongdoers. *Barnier v. Szentmiklosi*, 810 F.2d 594, 598 (6th Cir. 1987). Because discrimination has harmful consequences no matter what its form, the goals of deterrence would be ill served if punitive damages attached only to outrageous discrimination.

276 F.3d at 799–800 (footnote omitted).

■ Herein, the Government has requested that this Court award punitive damages to each of the victims of Matusoff's patterns and practices of discriminating on the basis of race and familial status. The Government has not, however, set forth a particular amount of punitive damages it believes the Court should award. Simply stated, the Court has little difficul-

ty finding that Matusoff acted with reckless indifference to the requirements of the FHA, when he engaged in patterns or practices of discriminating on the basis of race and familial status. Indeed, given that there is evidence that those discriminatory practices were in effect for about eight years, this Court has little difficulty finding Matusoff's behavior to have been outrageous and egregious. Accordingly, this Court finds that the goals of punishment and deterrence will be served by awarding each victim of those practices an amount of punitive damages in the sum of $5,000, a sum which this Court deems sufficient but not more than necessary both to punish Matusoff and to deter future similar wrongdoing on his part, assuming, arguendo, he is ever in a position to commit same. Since the Court has identified 26 victims of discrimination, the total amount of punitive damages awarded is $130,000.

### C. Injunctive Relief

■ Herein, the Government has requested that the Court enter a permanent injunction, ordering Matusoff:

(i) [to] abide by all aspects of the [FHA]; (ii)[to] develop written tenant application processing procedures and tenant selection criteria that is consistent with the [FHA] (ii [the second]) [to] attend fair housing training from a fair housing organization; (iii)[to] educate his employees and agents about their obligations under the [FHA] (iv)[to] obtain a signed statement from his employees and agents acknowledging that they have read and understand their responsibilities under the court order; (v)[to] take steps to ensure that the availability of housing opportunities at his apartment complexes is made known to all interested persons regardless of race, color, [ ] familial status, or other protected bases; (vi)[to] maintain rec-

ords of all dealings with prospective tenants, from the point when inquiries are made until leases are signed; and (vii)[to] submit regular reports of rental activities to the United States.

Doc. # 90 at 36. Recently, in *eBay Inc. v. MercExchange, L.L.C.,* —— U.S. ——, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006), the Supreme Court restated the principles applicable to the grant of a permanent injunction:

> According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction. See, e.g., *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 311–313, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982); *Amoco Production Co. v. Gambell,* 480 U.S. 531, 542, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987). The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court, reviewable on appeal for abuse of discretion. See, e.g., *Romero–Barcelo,* 456 U.S. at 320, 102 S.Ct. 1798.

*Id.* at 1839. Although those principles are not applicable in statutory actions where Congress has indicated to the contrary, no provision of the FHA demonstrates that Congress intended to allow a permanent injunction to be granted in the absence of consideration of the above equitable factors. Accordingly, the Court turns to the question of whether the Government has established the four requisites of perma-

nent injunctive relief, addressing initially its request for an order to Matusoff to abide by all aspects of the FHA.

■ Many of the victims of Matusoff's discriminatory practices have suffered irreparable injury. In *E.E.O.C. v. Chrysler Corporation,* 733 F.2d 1183 (6th Cir.1984), the Sixth Circuit concluded that the defendant had caused workers above the age of 55 to sustain irreparable injury, since they had suffered emotional distress and the like as a result of discriminatory treatment, i.e., being required to retire during a reduction in force, rather than being able to go on layoff with right of recall, similar to workers under the age of 55. Therefore, the Sixth Circuit concluded that the District Court had appropriately granted injunctive relief in favor of the Government, preventing the defendant from continuing its discriminatory practice. *See also Gresham v. Windrush Partners, Ltd.,* 730 F.2d 1417, 1423 (11th Cir.1984) (stating that "irreparable injury may be presumed from the fact of discrimination and violations of fair housing statutes"). Given that this Court has found that a number of the victims of Matusoff's discriminatory practices suffered emotional distress, it concludes that the Government has established irreparable injury. This Court concludes that the remedies available at law are inadequate to compensate for such injuries, emotional distress being difficult, if not impossible, to calculate with mathematical precision. In addition, since Matusoff will suffer no harm if enjoined from violating the FHA, the balance of hardships tips decidedly in favor of the Government. In *United States v. Edward Rose & Sons,* 384 F.3d 258 (6th Cir.2004), the Sixth Circuit noted that the public interest strongly supports eradicating housing discrimination. *Id.* at 264 (citing *Meyer v. Holley,* 537 U.S. 280, 290, 123 S.Ct. 824, 154 L.Ed.2d 753 (2003), and *Price v. Pelka,* 690 F.2d 98, 102 (6th Cir.1982)). There-

fore, granting a permanent injunction will further, rather than disservicing, the public interest.

Even though this Court has found that the Government has established the four prerequisites for a permanent injunction, enjoining Matusoff from violating the FHA, this Court will decline to enter such an order, because same would violate Rule 65(d) of the Federal Rules of Civil Procedure, which governs the form of permanent injunctions. Rule 65(d) provides:

> (d) *Form and Scope of Injunction or Restraining Order.* Every order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained; and is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.

The Government requests that this Court enter a permanent injunction, ordering Matusoff to abide by all aspects of the FHA. Quite simply, that proposed order does not comply with the requirement set forth in Rule 65(d) that an injunction "shall describe in reasonable detail ... the act or acts sought to be restrained." *See e.g., Keyes v. School Dist. No. 1, Denver, Colorado,* 895 F.2d 659, 668 (8th Cir.1990) (noting that an injunction merely ordering the defendant to obey the law is too vague to

meet the requirement of Rule 65(d)), *cert denied,* 498 U.S. 1082, 111 S.Ct. 951, 112 L.Ed.2d 1040 (1991). Moreover, even if this Court were to rephrase the requested injunctive relief to prohibit Matusoff from refusing to rent an apartment because of the race or familial status of the applicant, such revised injunctive relief would continue to violate Rule 65(d). For instance, in *Payne v. Travenol Labs., Inc.,* 565 F.2d 895 (5th Cir.), *cert. denied,* 439 U.S. 835, 99 S.Ct. 118, 58 L.Ed.2d 131 (1978), the Fifth Circuit concluded that an injunction, prohibiting "discriminating on the basis of color, race, or sex in employment practices or conditions of employment" (*id.* at 897), failed to satisfy the specificity requirement of Rule 65(d), because the terms of the injunction were as general as Title VII itself and, thus, did no more than instruct the defendant to "obey the law." *Id.* at 898. Moreover, in *E.E.O.C. v. Wooster Brush Co. Employees Relief Ass'n,* 727 F.2d 566 (6th Cir.1984), the District Court concluded that the Wooster Brush Company had violated Title VII, by contributing to a welfare plan which provided disability benefits to all forms of disability, except pregnancy, and enjoined it from "from discriminating against women on the basis of their gender." *Id.* at 576. The Sixth Circuit, relying upon *Payne,* concluded that this "obey the law injunction" violated Rule 65(d).[14] Accordingly, the Court declines to enter such an order.

The other seven requested types of injunctive relief are directed at the manner in which Matusoff should operate his three apartment complexes in the future. However, he has sold those complexes.[15]

---

**14.** The Sixth Circuit did, however, modify the quoted language to prohibit the denial of disability benefits to pregnant women. 727 F.2d at 576. Herein, there is no comparable way of modifying the Government's request that the Court order Matusoff to abide by the FHA.

**15.** The sale of the apartment complexes did not render the Government's request for permanent injunctive relief moot, even if it has resulted in the cessation of illegal conduct by Matusoff. In *Friends of the Earth v. Laidlaw Environmental Services, Inc.,* 528 U.S. 167, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000), the

As a consequence, it would not be possible for him to perform many of the tasks he would be ordered to accomplish with those types of injunctive relief. Obviously, he would not be in a position to violate the FHA through his ownership of the three apartment complexes in question, and there is no evidence that he presently possesses either the funds or the interest in purchasing and operating new or additional rental units. Accordingly, the Court exercises its discretion to deny those seven types of requested injunctive relief.

Based upon the foregoing, the Court declines to enter the requested injunctive relief.

### III. Conclusions of Law

1. This Court has subject matter jurisdiction over this matter in accordance with 28 U.S.C. §§ 1331 and 1345.

2. Matusoff has engaged in patterns or practices of discrimination against tenants and applicants for apartments on the basis of familial status and race, in violation of 42 U.S.C. § 3604(a) and (b).

3. The victims of those patterns and practices are entitled to recover compensatory and punitive damages in the amounts and for the reasons the Court has found above.

4. The Court exercises its discretion to decline to enter the requested injunctive relief.

Based upon the foregoing, the Court directs that judgment, in the amount of $535,000, be entered in favor of the Government and against Roger Matusoff. That sum is comprised of $405,000, for compensatory damages, and $130,000, for punitive damages.

The captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.

Supreme Court discussed the relationship between mootness and the cessation of illegal activity:

It is well settled that "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *City of Mesquite [v. Aladdin's Castle, Inc.,* 455 U.S. 283, 289, 102 S.Ct. 1070, 71 L.Ed.2d 152 (1982)]. "[I]f it did, the courts would be compelled to leave '[t]he defendant ... free to return to his old ways.'" *Id.,* at 289, n. 10, 102 S.Ct. 1070 (citing *United States v. W.T. Grant Co.,* 345 U.S. 629, 632, 73 S.Ct. 894, 97 L.Ed. 1303 (1953)). In accordance with this principle,

the standard we have announced for determining whether a case has been mooted by the defendant's voluntary conduct is stringent: "A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *United States v. Concentrated Phosphate Export Assn.,* 393 U.S. 199, 203, 89 S.Ct. 361, 21 L.Ed.2d 344 (1968). The "heavy burden of persua[ding]" the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness. *Ibid.*
528 U.S. at 189, 120 S.Ct. 693.