*Id.* In this case, Indian River Estates alleges that Preferred Properties "schemed to exonerate [its] own negligence by charging handicap discrimination." Appellants' Br. at 25. The charge of negligence apparently relates to the expiration of the written option on December 30, 1998. However, the surrender of property was properly involved in this case as a remedy for Indian River Estates' alleged violation of the FHA, which authorizes courts to order "such affirmative action as may be appropriate." 42 U.S.C. § 3613(c)(1); *see also Moore v. Townsend*, 525 F.2d 482, 485 (7th Cir. 1975) (explaining that "it matters not whether there was a specific contract or not; otherwise the very purpose of the [FHA] would be completely frustrated"). Because the district court was empowered to order specific performance, we conclude that no abuse of process occurred.

### III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0006P (6th Cir.)
File Name: 02a0006p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

PREFERRED PROPERTIES, INC.,
 *Plaintiff-Appellee,*

 *v.*      No. 00-4088

INDIAN RIVER ESTATES, INC.;
DUANE J. TILLIMON,
 *Defendants-Appellants.*

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 99-07342—David A. Katz, District Judge.

Argued: December 4, 2001

Decided and Filed: January 9, 2002

Before: KENNEDY, MOORE, and COLE, Circuit Judges.

_____

### COUNSEL

**ARGUED:** Harland M. Britz, BRITZ & ZEMMELMAN, Toledo, Ohio, for Appellants. Stephen M. Dane, COOPER & WALINSKI, Toledo, Ohio, for Appellee. **ON BRIEF:** Harland M. Britz, BRITZ & ZEMMELMAN, Toledo, Ohio, for Appellants. Stephen M. Dane, COOPER & WALINSKI, Toledo, Ohio, for Appellee.

---

## OPINION

---

KAREN NELSON MOORE, Circuit Judge. This case involves a dispute over an option contract to purchase undeveloped residential property in Toledo, Ohio, for the construction of rental housing for persons with disabilities. At trial, the jury returned a verdict for Preferred Properties, Inc. ("Preferred Properties") on its claims that Indian River Estates, Inc. ("Indian River Estates") and Duane J. Tillimon ("Tillimon") had 1) violated the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601-3631, and Ohio's Civil Rights Act by refusing to sell property based upon the disabilities of future residents and 2) breached the option contract. Indian River Estates and Tillimon now appeal the district court's denial of their motions for a judgment as a matter of law and for a new trial and its grant of summary judgment to Preferred Properties on their counterclaim of abuse of process. We **AFFIRM** the district court's decision to deny the defendants' motions, on the ground that the defendants violated the FHA. We also **AFFIRM** the district court's decision to grant summary judgment on the defendants' counterclaim.

## I. BACKGROUND

Preferred Properties is a non-profit corporation that owns and operates rental housing for persons with disabilities in Toledo, Ohio. Tillimon, the president of Indian River Estates, develops residential property in Toledo; Indian River Estates is a twenty-three lot subdivision in the Point Place area of Toledo. Since 1992, Preferred Properties has developed more than fifty affordable housing units for persons with disabilities. In 1995, Preferred Properties became interested in the Indian River Estates subdivision while searching for sites on which to base an application to the Section 811 program of the United States Department of Housing and

1036, 1048 (6th Cir. 2001). Summary judgment is appropriate when the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). No genuine issue of material fact exists "unless a reasonable jury could return a verdict for the nonmoving party." *Cockrel*, 270 F.3d at 1048. In reviewing a grant of summary judgment, we view the evidence in the light most favorable to the nonmoving party. *Id.*

The district court did not address this aspect of Indian River Estates' counterclaim in its otherwise detailed memorandum opinion. Although Indian River Estates does not term it as such, its counterclaim is a tort claim for abuse of process. To establish such a claim, a plaintiff must prove the following: "(1) that a legal proceeding has been set in motion in proper form and with probable cause; (2) that the proceeding has been perverted to attempt to accomplish an ulterior purpose for which it was not designed; and (3) that direct damage has resulted from the wrongful use of process." *Robb v. Chagrin Lagoons Yacht Club, Inc.*, 662 N.E.2d 9, 14 (Ohio 1996) (quoting *Yaklevich v. Kemp, Schaeffer & Rowe Co.*, 626 N.E.2d 115, 118 (Ohio 1994)). In *Robb*, the Ohio Supreme Court stated that abuse of process "connotes the use of process properly initiated for improper purposes." *Id.* (quoting *Clermont Envtl. Reclamation Co. v. Hancock*, 474 N.E.2d 357, 362 (Ohio Ct. App. 1984)). The *Robb* Court also noted:

> In an abuse of process case, "[t]he improper purpose usually takes the form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, such as the surrender of property or the payment of money, by the use of the process as a threat or a club." Prosser & Keeton on Torts (5 Ed. 1984) 898, Section 121. Simply, abuse of process occurs where someone attempts to achieve through use of the court that which the court is itself powerless to order.

## C.  Breach of Contract Claim

The defendants contend that no reasonable juror could have found that the parties agreed to extend the option.  They also argue that any verbal extension of the option after the expiration date of December 30, 1998, was barred by Ohio's Statute of Frauds.  Our review of Ohio caselaw raises some doubt about the validity of verbal extensions of option contracts.  *Compare Hassel v. Gaydos*, No. 292, 1924 WL 2076, at *1 (Ohio Ct. App. Nov. 15, 1924) (holding that a verbal extension of time on a written option to sell land was unenforceable under the Statute of Frauds), *with Reckart v. Lyons*, No. 92-L-180, 1993 WL 317447, at *2 (Ohio Ct. App. Aug. 13, 1993) (holding that there was no material issue of fact as to whether there was an oral modification to a lease/option agreement because the agreement specifically required any modifications to be in writing); *cf. Clark v. Guest*, 43 N.E. 862, 863 (Ohio 1896) (holding that a verbal extension of time on a contract for the sale of lumber was void).  However, given the outcome of the FHA claim, we decline to resolve the very close state law question of whether the option contract was extended in compliance with the Statute of Frauds.

## D.  Grant of Summary Judgment to Preferred Properties on Indian River Estates' Counterclaim

Finally, Indian River Estates argues that the district court erred in granting summary judgment to Preferred Properties on Indian River Estates' counterclaim, which alleged that Preferred Properties had claimed discrimination to force the sale of the eight lots after the option expired.[7]  We review de novo a district court's grant of a motion for summary judgment.  *Cockrel v. Shelby County Sch. Dist.*, 270 F.3d

---

[7] The counterclaim also alleged that Preferred Properties had falsely represented that it intended to acquire fourteen lots in the Indian River Estates subdivision.  Indian River Estates appears to have dropped this argument on appeal.

Urban Development ("HUD"), which supports housing for persons with disabilities.

On July 25, 1997, Lewis S. Ellis ("Ellis"), executive director of Preferred Properties, executed an option contract to purchase eight specific, noncontiguous lots in the Indian River Estates subdivision.[1]  The option was to expire on December 30, 1997, but Preferred Properties could extend the option through December 30, 1998, by depositing $1,000 for each of the eight lots before December 30, 1997.  On July 28, 1997, Preferred Properties applied to HUD for funding to construct handicapped-accessible housing units in the Indian River Estates subdivision.  The application proposed "to develop 8 lots for 15 dwelling units" and stated that "[a] private developer will develop open market duplexes for middle income residents on alternate lots to the proposed Section 811 units," so that Indian River Estates would "be an integrated community by income, racial mix and disability." Joint Appendix ("J.A.") at 382.

On November 14, 1997, Preferred Properties received notification from HUD that its application had been approved and that $1,037,000 had been reserved for the project.  On February 24, 1998, Preferred Properties paid the defendants $8,000 in earnest money for the purchase of the eight lots in the Indian River Estates subdivision.[2]  However, Tillimon had difficulty securing financing and city approval, which meant that necessary improvements to the Indian River Estates

---

[1] The crux of the parties' dispute is whether Ellis agreed to purchase eight lots, which constituted every other lot along the south and east sides of the Indian River Estates subdivision, or eight lots plus the six lots that were in-between them.

[2] The original option contract required Preferred Properties to forward the earnest money by December 30, 1997.  Ellis testified at trial that he talked with Tillimon at the end of 1997 and received his consent to payment after January 1, 1998.  Tillimon accepted the $8,000 check that Preferred Properties sent on February 24, 1998.

subdivision were not completed by the end of 1998 and thus precluded any purchase of the lots. The parties dispute whether the option, which was set to expire on December 30, 1998, was extended by oral agreement.

On March 17, 1999, Ellis prepared and sent to Tillimon a revised option agreement for the eight lots. On April 1, 1999, Tillimon proposed that the parties "sign a straight purchase contract," because Indian River Estates would soon begin construction, having obtained the requisite city approval and financing. J.A. at 19. With that letter, Tillimon forwarded two purchase contracts — one for eight lots and one for the six in-between lots, which he deemed unmarketable due to discrimination against persons with disabilities. Ellis signed and returned the purchase contract for the eight lots.

On May 7, 1999, Tillimon returned Preferred Properties' $8,000 deposit without any explanation. The next day, he wrote Preferred Properties a letter in which he questioned whether Preferred Properties was still "interested in purchasing the fourteen lots as previously agreed because of the unlikel[i]hood that anyone would rent the 'in between' twinplexes on the open market." J.A. at 21. Tillimon claimed to have received "numerous telephone calls from neighbors protesting the development" and expressed amazement at the "tremendous community opposition to handicapped housing in Toledo." J.A. at 21. He also stated that he had been sued for constructing handicapped-accessible housing elsewhere in Toledo.

On May 17, 1999, Ellis returned the $8,000 check and requested completion of the sale of the eight lots. He also noted, "While we wish to explore the feasibility of purchasing an additional six lots, these lots are not part of our option contract and would constitute a separate purchase." J.A. at 24. In a letter dated May 21, 1999, Tillimon responded by stating that Preferred Properties' option had expired on December 30, 1998, and that he would not sell scattered lots in the Indian River Estates subdivision. Tillimon also

We also conclude that a jury may award punitive damages for violations of the FHA, even if the defendant did not engage in egregious misconduct. Like 42 U.S.C. § 1981a, which was at issue in *Kolstad*, 42 U.S.C. § 3604 "does not require a showing of egregious or outrageous discrimination independent of the [defendant's] state of mind." *Kolstad*, 527 U.S. at 535. The FHA prohibits discriminatory housing practices, 42 U.S.C. § 3613(a)(1)(A), against persons with disabilities or those associated with such persons. *Id.* § 3604(f)(1). Relief for discriminatory housing practices requires only that a seller be engaged in unlawful discrimination.

Under *Smith* and *Kolstad*, the question for the availability of punitive damages is whether "the defendants acted with malice or reckless indifference that their actions might violate a federal statute of which they were aware." *Badami*, 214 F.3d at 998. In addition, we have previously indicated that the purpose of a punitive damages award is to deter future wrongdoing as well as to punish wrongdoers. *Barnier v. Szentmiklosi*, 810 F.2d 594, 598 (6th Cir. 1987). Because discrimination has harmful consequences no matter what its form, the goals of deterrence would be ill served if punitive damages attached only to outrageous discrimination.

In this case, the jury returned a special verdict finding that the defendants' conduct was "willful, wanton, or in reckless disregard" of the rights of Preferred Properties. J.A. at 122. Because we defer to the jury's judgment on factual matters, we conclude that the defendants' good-faith argument lacks merit. Furthermore, the jury could reasonably infer from the evidence presented at trial that Tillimon knew or perceived the risk that his actions violated federal law. Tillimon has been involved in the real estate industry for more than twenty years, during which time he has rented property to persons with disabilities. These facts suggest that Tillimon had the requisite knowledge to be held liable for punitive damages and are sufficient to support the verdict.

discrimination."). However, the *Kolstad* Court held that "an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable in punitive damages." *Id.* at 536. Employers who are simply "unaware of the relevant federal prohibition" or believe that the discrimination is lawful are not subject to punitive damages liability. *Id.* at 536-37.

We have not yet addressed whether the *Kolstad* standard for punitive damages is applicable in the context of the FHA, but two circuits have determined that it is. *Badami v. Flood*, 214 F.3d 994, 997 (8th Cir. 2000); *Alexander v. Riga*, 208 F.3d 419, 430-32 (3d Cir. 2000), *cert. denied*, 531 U.S. 1069 (2001).[6] In *Alexander*, the Third Circuit reversed the district court's denial of the plaintiffs' request to submit the issue of punitive damages to the jury. *Alexander*, 208 F.3d at 435. After the liability and compensatory and/or nominal damages phase of the trial, the jury had returned a special verdict finding that the plaintiffs' rights under the FHA had been violated by the owner and manager of an apartment building who repeatedly refused to deal with African-Americans but just as consistently responded to the inquiries of white individuals. *Id.* at 424-25. Because the jury did not award compensatory damages, the district court declined to send the issue of punitive damages to the jury, on the grounds 1) that the jury apparently did not believe that the defendant was liable under *Smith* and 2) that a punitive damages award required "more than intentional discrimination." *Id.* at 431. Citing *Kolstad*, the *Alexander* court held that the jury's finding of a FHA violation, which "necessarily encompasses a finding of intentional discrimination," meant that the plaintiffs could receive punitive damages without "demonstrat[ing] that the conduct was particularly egregious or malicious." *Id.*

---

[6]As Preferred Properties notes, a finding of malice is not required before punitive damages may be awarded against a party who engages in housing discrimination in violation of Ohio law. *Shoenfelt v. Ohio Civil Rights Comm'n*, 663 N.E.2d 1353, 1355-56 (Ohio Ct. App. 1995).

claimed that community opposition to handicapped-accessible housing was too strong to be borne:

> The cost of defending [against lawsuits filed by citizens] is dev[a]stating to any builder or developer and [his] subdivisions obtain a stigma making them unmarketable to the ordinary citizen. Perhaps, some day in the future things will be different, but we do not want to pay the price for a social experi[]ment that the community opposes.

J.A. at 27.

On June 2, 1999, Preferred Properties filed a complaint against Indian River Estates and Tillimon, alleging that the defendants had 1) violated the FHA and Ohio's Civil Rights Act by refusing to sell property based upon the disabilities of future residents and 2) breached the agreement to sell Preferred Properties the eight lots specified in the option contract. Preferred Properties sought 1) declaratory relief, 2) preliminary and permanent injunctive relief, 3) specific performance of the option contract, 4) compensatory and punitive damages, and 5) attorney's fees and costs. Preferred Properties also filed a motion for a temporary restraining order ("TRO") that would preclude the defendants from selling the eight lots to third parties.

The district court granted Preferred Properties' motions for a TRO and a preliminary injunction. On July 30, 1999, the defendants filed an answer and counterclaim, alleging that Preferred Properties 1) had made false representations that it intended to acquire fourteen lots in the Indian River Estates subdivision and 2) was "employing federal anti-discrimination laws in an effort to correct its own error in failing to exercise the option herein within the option period." J.A. at 77. On December 16, 1999, Preferred Properties filed a motion for summary judgment on the defendants' counterclaim and for partial summary judgment as to liability.

On January 26, 2000, the district court granted the first but not the second motion.

On February 29, 2000, the case proceeded to a trial by jury. On March 2, 2000, the jury returned a verdict for Preferred Properties on both the discrimination and breach of contract claims and awarded $31,500 in compensatory damages and $125,000 in punitive damages.[3]  The jury also answered several interrogatories, specifically finding that 1) Indian River Estates' refusal to sell or to negotiate for the sale of the eight lots was motived by the fact that Preferred Properties' renters are disabled, 2) Indian River Estates' conduct was willful, wanton, or in reckless disregard of Preferred Properties' rights, and 3) the parties had agreed to extend the option contract to purchase the eight lots.

On March 10, 2000, Preferred Properties filed a motion for a permanent injunction against further discrimination and for specific performance of the option contract.  On March 20, 2000, the defendants moved for a judgment as a matter of law and for a new trial.  On August 4, 2000, the district court denied the defendants' motions.  On August 24, 2000, the defendants filed a notice of appeal.  On October 11, 2000, the district court granted Preferred Properties' motion for a permanent injunction and for specific performance.[4]

---

[3]The district court later awarded $81,579.96 in attorney's fees and expenses to Preferred Properties.

[4]The defendants' notice of appeal, which was filed before the district court granted Preferred Properties' motion for a permanent injunction and for specific performance, may have been premature. *Cf. Harolds Stores, Inc. v. Dillard Dep't Stores, Inc.*, 82 F.3d 1533, 1542 (10th Cir.) (holding that the district court's "order denying [the defendant's] renewal motion for judgment as a matter of law did not become an appealable final decision under 28 U.S.C. § 1291 until the district court denied [the plaintiff's] claim for a permanent injunction"), *cert. denied*, 519 U.S. 928 (1996).

However, we have previously stated that a premature notice of appeal is effective to vest appellate jurisdiction when the judgment becomes final

motion for a judgment as a matter of law.  *Gray v. Toshiba Am. Consumer Prods., Inc.*, 263 F.3d 595, 598 (6th Cir. 2001).  Such a motion may be granted "only when there is a complete absence of fact to support the verdict, so that no reasonable juror could have found for the nonmoving party." *EEOC v. Harbert-Yeargin, Inc.*, 266 F.3d 498, 504 (6th Cir. 2001) (quoting *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1078 (6th Cir. 1999)).  "[W]e do not weigh the evidence, evaluate the credibility of the witnesses, or substitute our judgment for that of the jury." *Id.* at 510 (quoting *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 825 (6th Cir.), *cert. denied*, 522 U.S. 865 (1997)).  Instead, we view "the evidence in the light most favorable to the nonmoving party and decide if it was sufficient to raise a genuine issue of material fact for the jury." *Id.*  We will thus affirm the jury's verdict unless we are "left with the definite and firm conviction that a mistake resulting in plain injustice has been committed, or unless the verdict is contrary to all reason." *Id.* at 504 (quoting *Schoonover v. Consol. Freightways Corp. of Del. Local 24*, 147 F.3d 492, 494 (6th Cir. 1998) (quotation omitted), *cert. denied*, 525 U.S. 1140 (1999)).

The FHA provides that victims of discriminatory housing practices may recover actual and punitive damages.  42 U.S.C. § 3613(c)(1).  The standard for punitive damages in a federal civil rights action is based on the defendant's state of mind and does not require egregious or outrageous behavior. *See Smith v. Wade*, 461 U.S. 30, 56 (1983) (holding that a jury may award punitive damages in a § 1983 action "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others").  In *Kolstad v. American Dental Ass'n*, 527 U.S. 526 (1999), a Title VII employment discrimination case, the Supreme Court expressly rejected the argument that a defendant's conduct must be egregious to support a punitive damages award. *Id.* at 535 ("The terms 'malice' or 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in

based upon HUD's determination that the Owner has established a reasonable schedule and is making sufficient progress toward the start of construction.

J.A. at 309. The letter appears to be dated October 14, 1997; it is marked as received on November 14, 1997. The defendants argue that the fund reservation, which neither committed nor allocated funds in actuality, was canceled because Preferred Properties failed to meet HUD's conditions. Such a cancellation would preclude a jury from finding that Preferred Properties met its burden of proof. However, Ellis testified at trial that HUD had approved an extension of the fund reservation.[5] In light of this evidence, we are not persuaded that the district court committed a clear error of judgment in denying the defendants' motion for a new trial.

The defendants also challenge the jury's $125,000 punitive damages award to Preferred Properties, claiming that their refusal to sell was based on a good-faith belief that Preferred Properties had optioned all fourteen lots rather than any evil motive or intent on their part. This issue was presented in the defendants' motion for a judgment as a matter of law, which the district court denied. We review de novo the denial of a

---

[5]On appeal, the defendants contend that this evidence was inadmissible hearsay. However, as Preferred Properties notes, defense counsel did not raise an objection at trial. We therefore review the admission of this evidence for plain error. *United States v. Fortson*, 194 F.3d 730, 736 (6th Cir. 1999).

Preferred Properties claims that Ellis's conversation with the HUD official who approved the extension of the grant was not inadmissible hearsay because it was offered as a verbal act and not for the purpose of proving the truth of the matter asserted. The verbal acts doctrine applies where "legal consequences flow from the fact that words were said, *e.g.* the words of offer and acceptance which create a contract." BLACK'S LAW DICTIONARY, *supra*, at 1558; *see also* 2 JOHN W. STRONG, MCCORMICK ON EVIDENCE § 249, at 100-01 (5th ed. 1999). Because the question of whether HUD's extension of the grant was an offer is a close one, we conclude that the district court did not commit plain error.

## II. ANALYSIS

### A. Exclusion from Voir Dire

Tillimon first argues that the district court violated his constitutional rights by conducting at least part of the voir dire outside of his hearing. The record as it stands indicates that the district court began the voir dire in open court and then examined individual prospective jurors at the bench, thereby excluding Tillimon. During such a sidebar discussion, defense counsel raised an objection, observing that Tillimon felt "left out by not being able to participate at this level." J.A. at 177. The district court explained that he had "never had the client up here." J.A. at 178. The lawyer for Tillimon then noted an objection.

In *Fillippon v. Albion Vein Slate Co.*, 250 U.S. 76 (1919), the Supreme Court recognized the right of a civil litigant to be present in some capacity during the trial of his case: "We entertain no doubt that the orderly conduct of a trial by jury, essential to the proper protection of the right to be heard, entitles the parties who attend for the purpose to be present in person or by counsel at all proceedings from the time the jury is impaneled until it is discharged after rendering the verdict." *Id.* at 81. *Fillippon* thus left open the question of a party's right to be present personally. *See Helminski v. Ayerst Labs.*, 766 F.2d 208, 213 (6th Cir.) ("Consistent with due process the right to be present may be sufficiently protected in the party's absence so long as the litigant is represented by

---

prior to the disposition of the appeal. *Good v. Ohio Edison Co.*, 104 F.3d 93, 96 (6th Cir. 1997) (citing *Gillis v. U.S. Dep't of Health and Human Servs.*, 759 F.2d 565, 569 (6th Cir. 1985)); *see also Jackson v. TVA*, 595 F.2d 1120, 1121 (6th Cir. 1979) (indicating that "an appeal should not be dismissed because it was technically premature if in fact an appealable judgment or order was rendered below, the appellant clearly manifested his intent to appeal from it and the prevailing party below can show no prejudice resulting from the prematurity of the notice") (quoting 9 JAMES WM. MOORE, MOORE'S FEDERAL PRACTICE ¶ 204.14, at 983 (2d ed. 1975)).

counsel."), *cert. denied*, 474 U.S. 981 (1985). Appreciating the importance of the personal presence of a party, we concluded in *Helminski* that the "arbitrary exclusion" of a represented party "who wishes to be personally present in the courtroom" during the trial would violate the Due Process Clause of the Fifth Amendment. *Id.* at 213-14. Exclusions would comport with due process, however, if a litigant were unable to "comprehend the proceedings and aid counsel," engaged in "disruptive behavior," or gave "a knowing and voluntary waiver." *Id.* at 216-17.

Under *Fillippon* and *Helminski*, then, there is no doubt that a civil litigant has the right to be present in person "at all proceedings from the time the jury is impaneled until it is discharged after rendering the verdict." *Fillippon*, 250 U.S. at 81. The question before us is whether this right extends to the voir dire. According to Black's Law Dictionary (6th ed. 1990), the word "impanel" may be defined quite narrowly, as "[t]he act of the clerk of the court in making up a list of the jurors who have been selected for the trial of a particular cause," or more broadly, to include "[a]ll the steps of ascertaining who shall be the proper jurors to sit in the trial of a particular case up to the final formation." *Id.* at 752. We note that the selection of a jury has important consequences for the trial, and that parties "can often be helpful in noticing or pointing out things about certain jurors that their lawyers might not or could not see." *United States v. Gibbs*, 182 F.3d 408, 438 (6th Cir.), *cert. denied*, 528 U.S. 1051 (1999). We accordingly adopt the broader definition of "impanel" and hold that civil parties have the right to be present in person during the voir dire absent compelling reasons, which a district court must establish on the record so as to be reviewable on appeal. The exclusion of litigants will be reviewed under a harmless error standard. *Cf. id.* at 437.

In this case, the district court did not give a valid reason on the record for excluding Tillimon from the individual examinations of prospective jurors at the bench. However, Tillimon has not alleged any prejudice resulting from his absence that would warrant reversal. Although he argues on appeal that his exclusion prevented him from personally gaining an impression of the prospective jurors and making suggestions to defense counsel in the exercise of his peremptory challenges, we note that defense counsel could have questioned the jurors at the bench, informed Tillimon about their answers, conferred about strategy, and then moved to strike those jurors whom Tillimon wanted to remove. Tillimon's exclusion from the sidebar discussions did not completely foreclose his participation in the actual exercise of his peremptory challenges. Therefore, we hold that the district court erred in excluding Tillimon from part of the voir dire but that, in this case, the error was harmless.

**B.  Fair Housing Act Claim**

The defendants contend that they are entitled to a new trial on the discrimination claim because the jury instructions required proof by a preponderance of the evidence that Preferred Properties was ready, willing, and able to purchase the property at issue and a reasonable jury could not have found that Preferred Properties was such a buyer. We review the grant or denial of a new trial for an abuse of discretion, "defined as a definite and firm conviction that the trial court committed a clear error of judgment." *Monette v. AM-7-7 Baking Co.*, 929 F.2d 276, 280 (6th Cir. 1991).

At trial, Preferred Properties introduced as Plaintiff's Exhibit 2 a letter from HUD that notified Preferred Properties of its selection for $1,037,000 in reserved funds. The HUD letter stipulated:

The Fund Reservation will be canceled if the Sponsor/Owner fails to have control of an approvable site within 6 months of the date of this Notification or if construction, rehabilitation or acquisition from the RTC has not commenced within 18 months from the date of this Notification, unless further extensions beyond the 18 months are approved by HUD. Such extensions will be