NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0608n.06
No. 19-2079

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| In re: OAKLAND PHYSICIANS MEDICAL CENTER, LLC, dba Doctors' Hospital of Michigan, | ) ) ) ) | **FILED**<br>Oct 26, 2020<br>DEBORAH S. HUNT, Clerk |
| Debtor. | | |
| YATINDER M. SINGHAL, M.D., | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| Appellant, | ) ) | |
| v. | ) ) | |
| BASIL T. SIMON, Trustee, | ) ) | |
| Appellee. | ) | |

**BEFORE: GUY, BOGGS, and WHITE, Circuit Judges.**

**HELENE N. WHITE, Circuit Judge.** Appellant Yatinder Singhal, M.D., was a board member of Oakland Physicians Medical Center, LLC, dba Doctors' Hospital of Michigan (the Hospital), which filed for Chapter 11 bankruptcy protection. Appellee Basil Simon, in his capacity as liquidation trustee of the Hospital, filed an adversary proceeding against Singhal alleging, as relevant here, conversion based on Singhal's diversion of money owed to the Hospital under contracts the Hospital had with two medical schools. The district court granted summary judgment to Simon on his common-law-conversion claim. Singhal appeals, arguing that there is a genuine dispute of material fact about whether the Hospital's Board of Directors consented to the relevant transactions and that he is entitled to a setoff in the amount of a settlement between another doctor and Simon. We REVERSE the grant of summary judgment as to the contracts with one of the

medical schools, AFFIRM the grant of summary judgment as to the other, VACATE the setoff determination, and REMAND for further proceedings.

**I.**

The Hospital was formed in 2008 to acquire the assets of another hospital. Its members consisted of physicians and McLaren Health Center. In 2010, McLaren demanded repayment of a secured loan, and the other members advanced money to the Hospital to repay the loan and keep the Hospital functioning. Singhal is a practicing psychiatrist and was a shareholder and member of the Hospital's Board of Directors (Board) during the relevant times.

The Hospital operated a student-education program for which the Hospital accepted students from medical schools for clinical rotations in exchange for the schools' payments to the Hospital of an agreed sum for each student that the Hospital's doctors ("preceptors") trained. Two of those medical schools were Ross University School of Medicine (Ross), and Windsor University School of Medicine (Windsor).

In February 2012, Dr. Nikhil Hemady formed American Medical Education Group LLC (AMEG), with Hemady and Singhal each holding a 50% membership interest. In March 2012, pursuant to an affiliation agreement, Ross agreed to pay the Hospital $500 per week for each student that the Hospital's preceptors trained in a clinical rotation. In February 2013, Singhal sent a letter to Ross, which he signed as "Chairman, Board of Directors" of the Hospital, stating the following:

> This letter is to request that based on a decision made by the Board of Directors of Doctors' Hospital of Michigan earlier this week, all Ross payments moving forward be directed to [AMEG]. This decision will enable the clinical preceptors for various rotations at Doctors' Hospital to be paid in a timely manner. Can we please add the necessary provision to the existing agreement with Ross to make sure that this change is clearly stated?

Bk. AP R. 102-4.[1]

Singhal testified that the Hospital had well-known financial problems and a reputation of not paying its bills; thus, having AMEG receive the money from Ross and pay the doctors meant that more doctors would be willing to train the medical students. In accordance with Singhal's letter, Ross paid AMEG $894,500 from June 2013 through September 2015. AMEG, in turn, distributed some of that money to Singhal, Hemady, and other preceptors. According to Singhal, this arrangement was "net profit . . . , zero loss" for the Hospital, which was supposed to receive $96,000 per year in profit from AMEG. Bk. AP R. 124-9 at 7. Simon alleges, however, that the Hospital never received any money from AMEG. Singhal testified that it was Hemady's responsibility to remit payment to the Hospital, and that Hemady was questioned at the Board meetings about the payments. Hemady later settled Simon's claims against him arising out of Hemady's creation of AMEG for $250,000.

Similarly, in January 2013, the Hospital and Windsor entered into an affiliation agreement in which Windsor agreed to pay the Hospital $400 per week for each student the Hospital trained in a clinical rotation. In August 2013, Dr. Prakash Sanghvi formed DHOM Education, LLC (DHOM), with Sanghvi and Singhal each holding a 50% membership interest. From November 2013 through November 2015, Windsor paid DHOM approximately $184,000. Sanghvi testified that DHOM did not have a contract with Windsor or the Hospital.

Paragraph 11.6 of the Hospital's Operating Agreement provides:

A member of the Board of Directors shall have no authority to take action on behalf of the Company in his or her individual capacity, except pursuant to specific authorization by the Board of Directors or to the extent a member of the Board of

---

[1] The adversary proceeding against Singhal, 2:16-ap-05120 (E.D. Mich. Bankr.), will be cited as Bk. AP. The docket of the district court that filed the order being appealed, 2:18-cv-12147 (E.D. Mich.), will be cited as Dist. Ct.

>  Directors also holds an executive position as an officer or agent of the Company and takes action in that capacity.

Bk. AP R. 113-4 at 4. Paragraph 11.3(a)(i) of the Operating Agreement provides that the Board of Directors has

>  [t]he authority to approve any transaction involving the Company in which a . . . member of the Board of Directors has an interest . . . , provided that the transaction is fully disclosed to all members of the Board of Directors and terms of the transaction are 'arms-length' and fair to the Company.

*Id.* at 3.

In July 2015, the Hospital filed a voluntary petition under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Michigan. The bankruptcy court appointed Simon as trustee, and later as liquidation trustee. Singhal filed a proof of claim in the amount of $1,499,983.13. Simon then filed an adversary proceeding against Singhal. In his second amended complaint, Simon alleged seven counts against Singhal: recharacterization of advances by Singhal (Count I); fraudulent transfers under 11 U.S.C. §§ 544, 548(a)(1)(B), 550 and 551 (Count II); avoidance of fraudulent transfers under Michigan's Uniform Fraudulent Transfer Act, Mich. Comp. Laws § 566.31 *et seq.*, and 11 U.S.C. §§ 544(b) and 550 (Count III); breach of statutory duties to act in good faith and in the best interests of the company (Count IV); common-law and statutory conversion (Count V); equitable subordination of claims (Count VI); and claim disallowance under 11 U.S.C. § 502(d) (Count VII).

Both parties moved for partial summary judgment, with Simon seeking summary judgment on Counts II, III, and V, and Singhal seeking summary judgment on Counts II-V. After the bankruptcy court disposed of the summary-judgment motions, the district court withdrew the reference[2] as to Counts IV and V, vacated the bankruptcy court's order as to those counts, and

---

[2] The bankruptcy court is a unit of the district court and is empowered by statute, upon referral by a district court, which occurred here, to "hear and determine all cases under title 11 and all core proceedings arising under title

ordered the bankruptcy court to file a report and recommendation on those counts. The bankruptcy court entered a report and recommendation concluding that Simon was not entitled to summary judgment on Count IV; that Simon was entitled to summary judgment on his common-law-conversion claim; and that Singhal was entitled to summary judgment on Simon's statutory-conversion claim. Singhal objected to the report and recommendation's conclusion that Simon was entitled to summary judgment on the common-law-conversion claim, arguing in part that Singhal had presented a genuine dispute of material fact about whether the Board consented to Singhal's diverting the payments from Ross and Windsor to AMEG and DHOM, and that any recovery should be reduced by the amount of Simon's settlement with Hemady.

The district court overruled Singhal's objections and adopted the bankruptcy court's report and recommendation. The district court concluded that Singhal "has not submitted any evidence of board approval," and that there was no reason to set off or reduce the damages based on Simon's settlement with Hemady because the common-law rule of setoff had been abrogated and because "the claims against Hemady were not parallel claims of conversion, and the law allows for 'some overlap,' while not barring double recovery." Dist. Ct. R. 18, PID 234, 239. The district court accordingly entered judgment on Simon's common-law-conversion claim in the amount of $1,078,500 and closed the case.[3] Singhal now appeals.

---

11, or arising in a case under title 11," and may enter a final order with respect to those proceedings. 28 U.S.C. § 157(b)(1). However, "[t]he district court may withdraw, in whole or in part," the reference to the bankruptcy court "on its own motion or on timely motion of any party, for cause shown." *Id.* § 157(d).

[3] Simon represented that he waived his claim under Count IV. "With th[at] claim[] out of the picture, the district court's order below is a final order, and we have appellate jurisdiction." *G.G. Marck & Assocs., Inc. v. Peng*, 309 F. App'x 928, 932 (6th Cir. 2009); *see also Scarbrough v. Perez*, 870 F.2d 1079, 1082 (6th Cir. 1989).

**II.**

A.

Singhal first argues that the district court erred in finding that there was no genuine dispute of material fact about whether Singhal was liable for common-law conversion for diverting the Ross and Windsor payments to AMEG and DHOM. We review the district court's determination de novo, viewing all evidence in the light most favorable to Singhal, the non-moving party, and drawing all reasonable inferences in his favor. *See In re Tri-City Turf Club, Inc.*, 323 F.3d 439, 442 (6th Cir. 2003); Fed. R. Civ. P. 56(a).

Under Michigan law, conversion is "any distinct act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein." *Aroma Wines & Equip, Inc. v. Columbian Distrib. Servs., Inc.*, 871 N.W.2d 136, 141 (Mich. 2015) (internal quotation marks and citations omitted). For purposes of this appeal, the parties agree that Singhal directed that the Ross and Windsor payments be made to AMEG and DHOM, respectively, and that these acts constitute common-law conversion unless Singhal disclosed his interests in AMEG and DHOM to the Board and obtained Board approval for redirecting the payments, consistent with the Operating Agreement and Michigan law.

Regarding the disclosure of his interests in AMEG and DHOM, Singhal relies on the following portions of his deposition testimony:

> Q: Did you tell [the other Board members] Dr. Short and/or Dr. Jolly that you had an interest in American Medical Education Group, a financial interest?
> A: They knew that. And they were also rotating with them. I don't know about Dr. Jolly but I thought Dr. Jolly, also, had one medical student one time, if I remember correctly.
> . . . .
>
> Q: Were the board members aware that you had an interest in DHOM?
> A: Board members knew that I had an interest and board members also knew that I

got the contract with the hospital from them because of my own relationship with them.

Bk. AP R. 124-9 at 3, 7.

Simon argues that the testimony about the Board's knowledge of Singhal's interests in AMEG and DHOM is insufficient because "[n]othing in [Singhal's] deposition testimony indicates the specific details of the Board members' knowledge or that Defendant in any way complied with the requirements of the Operating Agreement or the LLC Act." Appellee's Br. at 19. The bankruptcy court appeared to conclude that this testimony presented a genuine dispute of material fact about whether the Board members had the requisite knowledge of Singhal's interest in the companies. We agree. Simon fails to explain how the cited testimony does not establish a genuine issue as to whether there was sufficient disclosure of Singhal's interests consistent with the Operating Agreement or Michigan law. The portion of the Operating Agreement cited by Simon requires that "the transaction" involving the Hospital in which a Board member has an interest be "fully disclosed to all members of the Board of Directors" without specifying how a Board member must disclose his interest in the other company with whom the Hospital is transacting. Bk. AP R. 113-4 at 3. Michigan Compiled Laws § 450.4409 (2010) provides:

> (1) Except as otherwise provided in an operating agreement, a transaction in which a manager or agent of a limited liability company is determined to have an interest shall not, because of the interest, be enjoined, be set aside, or give rise to an award of damages or other sanctions, in a proceeding by a member or by or in the right of the company, if the manager or agent interested in the transaction establishes any of the following:
>
> . . . .
>
> > (c) The material facts of the transaction and the manager's or agent's interest were disclosed or known to the members entitled to vote and they authorized, approved, or ratified the transaction.
>
> . . . .
>
> (3) Except as otherwise provided in the articles of organization or an operating agreement, a transaction is authorized, approved, or ratified for purposes of subsection (1)(c) if it receives a majority of votes cast by the members entitled to vote that do not have an interest in the transaction.

Even assuming that an interested director must comply with the statute to avoid liability for common-law conversion, Singhal testified plainly that his interests in AMEG and DHOM were "known to the members entitled to vote," Mich. Comp. Laws § 450.4409(1)(c) (2010). Although the testimony is sparse and the full deposition transcript is not in the record, viewing this evidence in the light most favorable to Singhal and drawing all reasonable inferences in his favor, and consistent with the bankruptcy court's determination, Singhal presented a genuine dispute of material fact about whether the Board members knew of his interests in AMEG and DHOM, which would satisfy the plain language of § 450.4409(1)(c) and the Operating Agreement on this point.

At oral argument in this appeal, Simon argued that Singhal did not comply with the Operating Agreement because Singhal's lack of specificity about the terms of the AMEG transaction does not allow a reasonable jury to conclude that the "terms of the transaction are 'arms-length' and fair to the [Hospital]." Bk. AP R. 113-4 at 3. Simon did not cite or discuss this language in his briefing to the bankruptcy court, the district court, or this court, and the district court did not grant summary judgment on this basis. Rather, although Simon generally stated that Singhal did not comply with the Operating Agreement or Michigan law in diverting the Ross and Windsor funds to other companies, Simon focused only on whether Singhal presented evidence that the other Board members were aware of Singhal's interest in AMEG and DHOM and approved the transactions with them. Failure to raise an argument below generally forfeits the argument on appeal. *See United States v. Boumelhem*, 339 F.3d 414, 428 (6th Cir. 2003) (explaining that a party forfeits an "alternative argument in support of a lower court's decision" "by failing to raise the issue in the district court"). We have the discretion to consider arguments presented for the first time on appeal, *Hayward v. Cleveland Clinic Found.*, 759 F.3d 601, 615 (6th Cir. 2014), and may affirm on any grounds supported by the record, *Wallace v. Oakwood Healthcare, Inc.*, 954

F.3d 879, 886 (6th Cir. 2020). However, here, neither party submitted the full transcripts of the relevant depositions into the record, or even the full Operating Agreement, instead submitting only the portions of the depositions and Operating Agreement that supported the specific arguments made. Without a full record or adequate briefing on this issue, we cannot say that "the proper resolution is beyond any doubt" or that "the issue is presented with sufficient clarity and completeness and its resolution will materially advance the progress of already protracted litigation," circumstances that might make it appropriate to consider an issue not raised in the district court. *Hayward*, 759 F.3d at 615 (alteration, internal quotation marks, and citations omitted).

Further, the evidence in the record does not establish as a matter of law that the terms of the Ross-AMEG-Hospital arrangement were not fair to the Hospital or were not disclosed to the Board. Simon characterizes the arrangement as the Hospital simply agreeing "to [forgo] over $1,000,000 in revenue." Appellee's Br. at 17. But Singhal testified that by forming AMEG, Hemady and Singhal were able to recruit more doctors to train the medical students, doctors who otherwise would have declined the opportunity due to the Hospital's reputation for not paying its bills, which in turn provided more profit for the Hospital. Further, according to Singhal, AMEG incurred the liabilities of paying the preceptors, and Hemady was supposed to pay the Hospital nearly $100,000 per year as profit. Finally, Singhal testified that Hemady "explained the situation" around the Ross payments being redirected to AMEG, and "we approved it." Bk. R. 124-9 at 4. Viewing this evidence in the light most favorable to Singhal and drawing all reasonable inferences in his favor, a reasonable jury could conclude that the transaction was disclosed to the Board and was fair to the Hospital.[4]

---

[4] To be sure, there are numerous other facts that can and should be considered in determining whether the transaction was disclosed to the Board and fair to the Hospital, including how much profit the Hospital was receiving

Regarding receiving authorization from the Board to redirect the Ross and Windsor payments to AMEG and DHOM, Singhal relies on the following portions of his deposition testimony:

> Dr. Hemady came and asked the board. So the idea was to train these students at different doctors' offices so that those doctors get motivated to bring the business to our – Doctors' Hospital. Dr. Hemady because he was in family practice and involved with that – those doctors wanted to come but wanted to be compensated obviously for their services and they will not trust Doctors' Hospital for payment because Doctors' Hospital – I'm going into detail. I don't know if you need that or not. I don't know.
>
> Q: You can continue.
>
> A: So it was Dr. Hemady – so our situation was that we cannot afford to have any business, which causes a loss.
>
> Q: Which goes where?
>
> A: Causes a loss to the hospital. So it was – Dr. Hemady said he wanted to rotate the hospital so how could we do that. The board approved that. This medical education trust will give a fixed amount to the hospital every month or whatever . . . . So the hospital situation was net gain, zero cost, zero loss. So the hospital was making money. Another corporation was formed from which he paid the doctors. The doctors will trust the corporation to be paid on time, unlike the hospital. They will not trust the hospital that they will get it on time. That's all I know about American Education.

Bk. AP R. 124-9 at 2.

> Q: The letter indicates that there was a decision made by the board – by the way, the letter is dated February 6 of 2013 and it indicates that there was a request to request based on a decision of the board of directors of Doctors' Hospital that all Ross payments moving forward be directed to American Medical Education Group at the 461 West Huron Street, Suite 610, Pontiac, Michigan address, right?
>
> A: Yes.
>
> Q: That's what it says, right?
>
> A: Yeah.
>
> Q: Is that the address of the hospital?
>
> A: Yes.

---

prior to AMEG's involvement, the reasonableness of the management fees charged by Hemady and Singhal, whether other companies besides AMEG were considered by the Board or made offers, and details about Hemady's explanation of "the situation" to the Board. Had Simon specifically raised these issues in his summary-judgment briefing, the parties may have been able to flesh out these issues by submitting additional portions of deposition transcripts, or it would have alerted Singhal of the necessity to gather further evidence, if available, to address these issues.

Q: The Ross payments you're referring to the – in that letter you're referring to the payments that would have been made pursuant to the affiliation agreement, which is marked as Exhibit 1; would that be a fair statement?

A: Yes.

Q: And the board approved this change?

A: Yes, it did.

Q: Who approved this?

A: Board means board, right?

Q: So Dr. Short agreed to this?

A: You know, board means three members of the board so I can't tell you. If the board is approving it, the board is approving it, right?

Q: Okay. Who were the members of the board of directors in 2013?

A: I think me, Dr. Short, I think, and Dr. Jolly.

Q: All right. And you're saying that the three of you approved the payments change from the hospital to American Medical Education Group?

A: As I said earlier, Dr. Hemady came to the board. He explained the situation. The hospital got money and we approved it because that's the way we could get other doctors to bring business to the hospital. And you're still saying the same thing. That's what we talked about it.

*Id.* at 3-4.

The bankruptcy court reasoned that Singhal's testimony only pertained to the purpose of forming AMEG and DHOM and the Board's approval of the training program between the Hospital and the medical schools, but not whether the Board approved the redirection of funds from Ross and Windsor to AMEG and DHOM. The district court did not elaborate further. Simon does not defend the bankruptcy court's reasoning on appeal, and Singhal's testimony that the "board approved this change" clearly refers to the Board's approval of redirecting the payments from Ross to AMEG. Simon argues instead that

> [t]o the extent that Defendant now offers his testimony to prove the truth of the matter asserted i.e. Board approval of the diversion of payments to AMEG and DHOM, these out of court statements by the Debtor's board members are hearsay under Federal Rule of Evidence ("F.R.E.") 801 (c) and inadmissible under F.R.E. 802. Defendant's testimony regarding the Board's approval cannot be considered on a Motion for Summary Judgment.

Appellee's Br. at 19-20.

The testimony is not hearsay. Singhal was a member of the Board and the testimony is about actions taken by the Board, which he would have been present to observe. Although unclear from his argument, Simon's theory appears to be that Singhal is necessarily relaying statements by each of the Board members for the truth of those statements. The issue, however, is not whether the Board members' statements were true, but whether they occurred at all, and thus whether approval was actually given. As the Seventh Circuit has explained,

> [p]erformative utterances are not within the scope of the hearsay rule, because they do not make any truth claims. Had the marshal overheard Dodd tell Montana, 'your father has promised me $10,000,' Dodd's overheard statement would have been hearsay, because its value as evidence would have depended on its being truthful, that is, on such a promise having actually been made. But what in fact was overheard was merely a demand—in effect, 'give me $10,000'—and so the only issue of credibility was whether the marshal was reporting the demand correctly, and *his* testimony was not hearsay.

*United States v. Montana*, 199 F.3d 947, 950 (7th Cir. 1999); *see also Preferred Properties, Inc. v. Indian River Estates, Inc.*, 276 F.3d 790, 798 n.5 (6th Cir. 2002) (explaining that the "verbal acts doctrine" applies where "legal consequences flow from the fact that words were said, *e.g.*, the words of offer and acceptance which create a contract" (internal quotation marks and citations omitted)); Fed. R. Evid. 801 advisory committee note to subdiv. (c) ("If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay."). Because Singhal's testimony does not seek to introduce out-of-court statements for the purpose of proving the truth of the matters asserted, but only that the statements of approval were made, his testimony is not inadmissible hearsay. *See* Fed. R. Evid. 801(c).

Finally, Simon notes that there is strong evidence discrediting Singhal's testimony, including the testimony from the other two Board members that they knew nothing about the payments being redirected to AMEG. But Singhal testified to the contrary, and Singhal's

testimony is not so implausible as to defy "common sense." Appellee's Br. at 20. Singhal provided an explanation as to why it would be beneficial to the Hospital for the preceptors to be paid through a different company, and some of the preceptors, including one of the other Board members, were paid by AMEG, apparently without questioning why AMEG was the company paying them for their teaching services.

Accordingly, Singhal presented a genuine dispute of material fact about whether he obtained the requisite authorization from the Board to divert the payments from Ross to AMEG.

Although Singhal's testimony is sufficient to survive summary judgment on the Ross payments, Singhal did not testify similarly about the diversion of payments from Windsor to DHOM or point to any evidence that would allow us to infer that the Board approved the diversion of the Windsor payments. Nor does the remaining evidence Singhal relies on suffice to create a genuine dispute of material fact. As the district court correctly determined, "Singhal cannot advance pure legal argument that the missing board minutes may contain favorable evidence that would create a factual dispute." Dist. Ct. R. 18, PID 234. Thus, Singhal's argument—rather than his testimony—that the authorization is documented in the missing Board minutes is not sufficient to create a genuine dispute of material fact about whether the Board approved the Windsor-DHOM-Hospital arrangement. Singhal also points to a statement made in his Answer that he acted at all times with Board approval, but Singhal's reliance on a statement made in his unverified Answer does not constitute evidence for purposes of summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

Accordingly, we reverse the grant of summary judgment as to the money Ross paid to AMEG, and affirm the grant of summary judgment as to the diverted Windsor funds.

B.

Singhal also argues that the district court erred in concluding as a matter of law that he is not entitled to a setoff in the amount of the settlement between Hemady and Simon, and that judgment against Singhal for the full amount of the converted funds results in an unjust double recovery.[5]  We review this question de novo.  *Laethem Equip. Co. v. Deere & Co.*, 485 F. App'x 39, 51 (6th Cir. 2012).  The district court rejected Singhal's argument, reasoning as follows:

> As to damages, if one joint tortfeasor pays "a lump sum in exchange for a release, and a judgment is subsequently entered against the non-settling tortfeasor, the judgment is reduced *pro tanto* by the settlement amount." This principle is known as the common-law rule of "setoff." However, the common-law rule of setoff has "generally [] been abrogated in Michigan." Also, applying the setoff rule presupposes that the parties are joint tortfeasors, and that the settlement reached as to one party amounts to a parallel claim against the non-settling party.

> Michigan courts have said that the general rule prohibiting unjust enrichment by "double recovery" is not offended simply because there may be "some overlap" between co-defendant's conduct. On the contrary, Michigan courts have recognized that "there is no rigid rule against overcompensation," and "making tortfeasors pay for the damages they cause can be more important than preventing overcompensation."

> . . . .

> The evidence shows that Singhal alone was responsible for converting the Trustee's money (and/or right to payments). Whether Singhal distributed the converted funds to several doctors, or kept the entire amount for himself, does not affect his liability to Trustee for the full amount of his conversion. In other words, if a person steals $1,000,000, they are liable for $1,000,000; the fact that they gave $500,000 to a third-party does not alleviate any liability. Because Singhal was responsible for the conversion of $1,078,500, the R&R did not err in its damages calculation.

> Singhal says that he is entitled to a setoff for the amount of the settlement reached between Trustee and Dr. Hemady, who is Singhal's' [sic] 50% partner in AMEG. However, the settlement between Trustee and Dr. Hemady related to different claims and/or theories of liability. It appears that $60,000 of the $250,000 settlement related to a turnover claim under 11 U.S.C. §542 and the remaining $190,000 relates to unearned monies. Because the claims against Hemady were not parallel claims of conversion, and the law allows for "some overlap," while not

---

[5] Singhal did not raise this argument with the bankruptcy court during the initial summary judgment briefing in the bankruptcy court.  Simon argued to the district court, in response to Singhal's objection to the bankruptcy court's report and recommendation, that Singhal therefore had forfeited this argument.  The district court did not determine whether the argument was forfeited, nor does Simon argue on appeal that Singhal forfeited this argument.  Thus, we do not consider this issue.

> barring double recovery, the Court sees no reason to [set off] the Hemady settlement amount from Singhal's liability for conversion.

Dist. Ct. R. 18, PID 232-33, 238-39 (first alteration in original) (citations omitted).

Singhal argues that the district court erred in relying on Michigan's general abrogation of the common-law rule of setoff because it failed to recognize that setoff still applies to jointly liable tortfeasors, and he contends that Singhal and Hemady are jointly liable. Singhal further argues that the theories of liability for Hemady and Singhal are irrelevant because the damages against Singhal and the settlement with Hemady were meant to compensate for the same harm. Simon responds that Hemady is not jointly liable with Singhal for conversion; that the distinct theories of liability against Hemady and Singhal preclude a setoff; and that Singhal's argument fails because he did not file a third-party complaint against Hemady in the adversary proceeding.

The district court did not err in finding that Singhal is not entitled to a setoff on the basis that he and Hemady are jointly liable. "State substantive law applies to setoff claims." *Laethem Equip.*, 485 F. App'x at 51 (citing *BP Exploration & Oil Co. v. Maintenance Servs., Inc.*, 313 F.3d 936, 942 (6th Cir. 2002)). Singhal argued to the district court, contrary to his argument on appeal, that "[i]t is well settled in Michigan that the liability of each defendant for damages is several only and not joint." Dist. Ct. R. 12, PID 119. He cannot turn around on appeal and argue that he and Hemady *are* jointly liable and that he is entitled to a setoff on that basis when he never made that argument to the district court. Further, Singhal's argument to the district court is consistent with Michigan law for most tort actions, including claims of conversion. Although Michigan abolished joint and several liability in most actions "based on tort or another legal theory seeking damages for personal injury, property damage, or wrongful death," Mich. Comp. Laws § 600.2956 (1996), this court has recognized that several Michigan Courts of Appeals have held that the statute applies "to torts beyond those involving personal injury, property damage, and wrongful death," *Mike's*

*Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 413-14 (6th Cir. 2006)); *see also Laethem Equip.*, 485 F. App'x at 47 (explaining that "there is no dispute that a reduction would have been warranted if the jury found [the defendant] liable on only the tort theory" in a case not involving personal injury, property damage, or wrongful death).

Prior to 1995, Michigan had a joint-and-several-liability scheme. Michigan followed the common-law rule of setoff providing that in a tort action against joint tortfeasors, where "one alleged tortfeasor agrees to settle his potential liability by paying a lump sum in exchange for a release, and a judgment is subsequently entered against the non-settling tortfeasor, the judgment is reduced *pro tanto* by the settlement amount." *Markley v. Oak Health Care Investors of Coldwater, Inc.*, 660 N.W.2d 344, 346 (Mich. Ct. App. 2003). In 1995, Michigan

> abolished joint and several liability in most contexts and created an allocation-of-fault system in which each tortfeasor is liable only for the portion of the total damages that reflects that tortfeasor's percentage of fault. Because a system of several liability already incorporates the fault of *all* tortfeasors in establishing every individual tortfeasor's proportion of fault, there is no danger that the plaintiff will be overcompensated for the injury by the failure to set off the amount of another tortfeasor's settlement.

*Velez v. Tuma*, 821 N.W.2d 432, 437 (Mich. 2012) (footnote omitted). Because Michigan abolished joint and several liability for most tort actions, Singhal is not entitled to a setoff in the amount for which Hemady settled with the Hospital on the basis that he and Hemady are jointly liable. *See id.*

However, there is no indication that Michigan abolished its general rule that only one recovery is allowed for a single injury, *see Great N. Packaging, Inc. v. General Tire & Rubber Co.*, 399 N.W.2d 408, 410 (Mich. Ct. App. 1986), which is "distinct, but not necessarily incompatible" with the setoff rule, *K.S. v. Detroit Pub. Sch.*, 153 F. Supp. 3d 970, 979 (E.D. Mich. 2015) (citation omitted); *see also Laethem Equip.*, 485 F. App'x at 50-53 (analyzing whether the defendants were entitled to a reduction in damages based on the one-recovery rule despite finding

that comparative-fault principles applied to the claims at issue). "To determine whether a double recovery has occurred, this Court must ascertain what injury is sought to be compensated. Thus, where a recovery is obtained for any injury identical with another in nature, time, and place, that recovery must be deducted from the plaintiff's other award." *Grace v. Grace*, 655 N.W.2d 595, 602 (Mich. Ct. App. 2002) (citations omitted). The amount of reduction is determined by analyzing the extent to which the first recovery overlaps with the second, and to make that determination "it is necessary to go beyond the theoretical damages and look at the actual damages sought and proved by plaintiff" in a particular case. *Great N. Packaging*, 399 N.W.2d at 412.

Simon settled with Hemady without initiating an adversary proceeding, and thus the precise theories of liability underlying the settlement were never evaluated in court. Nor is the settlement agreement, or any testimony about the settlement, in the record. The district court, however, accepted Simon's characterization in his brief that "$60,000 of the $250,000 settlement related to a turnover claim under 11 U.S.C. §542 and the remaining $190,000 relates to unearned monies." Dist. Ct. R. 18, PID 239 (citation omitted). In the bankruptcy proceeding, Simon filed a motion for order authorizing him to compromise claim against Hemady. The motion provides, in relevant part:

> 9. One of the purposes of the Liquidation Trust is to pursue Trust Causes of Action which included certain alleged claims against [Hemady] relating to the creation of [AMEG] to administer a program originated by Hemady between the Debtor and a medical school which provided students to the clinical rotation program of the Debtor.

> 10. As a result of the Trustee's investigation of the Debtor's financial affairs, the Trustee asserted that Hemady, together with [Singhal] formed AMEG to administer the clinical rotation programs for [Ross] pursuant to an Affiliation Agreement dated March 26, 2012 between the Debtor and Ross and to receive payment from Ross under such agreement. Hemady asserts that AMEG was created because the Debtor was mismanaging the Affiliation Agreement and administering the clinical rotation program in a manner that would have resulted in Ross . . . cancelling the Agreement had AMEG not been created and taken over the program. The Trustee asserts otherwise.

11. Over the past several months, Hemady and the Trustee engaged in discussions and reviewed documents provided by the parties relating to the Trustee's claims in an attempt to resolve this Trust Cause of Action without the filing of an adversary proceeding. The parties have agreed to settle the Trustee's claims consistent with the terms and conditions contained in the proposed order attached hereto as Exhibit 1. Under the settlement, Hemady has agreed, pursuant to a prior demand by the Trustee, to turn over funds remaining in the AMEG bank accounts in the sum of $60,000, and to pay the additional sum of $190,000.00 as follows: four annual consecutive installments of $47,500.00 commencing October 1, 2017 and continuing until paid in full. Hemady shall also appear for a deposition under oath to testify about AMEG and the involvement of Singhal and others in connection with the Trustee's claims.

Dist. Ct. R. 16-2, PID 186-87. The bankruptcy court granted the motion, ordering that

the Trustee shall be and hereby is authorized to compromise his claim against [Hemady] in exchange for the turnover of sums remaining in the account of [AMEG], being the sum of $60,000, plus payment of additional funds in the amount of $190,000.00;

IT IS FURTHER ORDERED that said sum shall be paid as follows: $60,000.00 in the AMEG account,[] payable upon the entry of this Order and the balance of $190,000.00 paid in four equal consecutive annual installment payments of $47,500.00 commencing October 1, 2017 and continuing until paid in full.

*Id.* at PID 183.

Although the record is not fully developed on this issue, the basis for the claims against Hemady set forth in the motion appears to be the same conduct that is the basis for the conversion claim, i.e., the funds from Ross being diverted from the Hospital to AMEG. Simon, at one point in the litigation, agreed, as he described the claim against Hemady to be "substantially similar to the claim he makes against [Singhal]." Bk. AP R. 113 at 15. Because the record on summary judgment permits a finding that the settlement with Hemady compensates the Hospital for the identical injury as the damages for the conversion claim against Singhal, Singhal may be entitled to a reduction in damages pursuant to the one-recovery rule.

The district court's rationale in rejecting Singhal's argument at this stage of the proceedings is unpersuasive. First, it concluded that there were distinct theories of liability applicable to

Singhal and Hemady by accepting Simon's statement about the theory of Hemady's liability. Even if Simon's description of his theory of liability against Hemady is accurate—which is unknown from the record—the theories of liability need not be identical for the one-recovery rule to apply. For example, in *Grace*, the plaintiff sought damages against her husband for fraudulently concealing marital assets and not disclosing the true value of disclosed assets. 655 N.W.2d at 602. In a separate action, the plaintiff sought damages against her divorce attorney for legal malpractice based on the attorney's failure to discover the assets the husband concealed and the true value of the disclosed assets. *Id.* Despite the distinct theories of liability against each, the Michigan Court of Appeals held "that plaintiff has sought to recover damages for an injury identical in nature, time, and place against both defendant and her divorce attorney" and affirmed the trial court's decision to reduce the jury award by the settlement amount in the malpractice action. *Id.* at 603; *see also Chicilo v. Marshall*, 460 N.W.2d 231, 232 (Mich. Ct. App. 1990) ("In making such a determination [about whether a double recovery occurred], the nature of the conduct causing the injury and the label attached to the plaintiff's claims are of little relevance.").

Further, the district court's explanation that Michigan law allows for "some overlap" is insufficient to justify its conclusion that Singhal is not entitled to a setoff or reduction as a matter of law. The district court relied on *K.S.*—a federal district court case—but the facts there are distinguishable. In *K.S.*, the plaintiff sued Detroit Public Schools (DPS), DPS officials, and an individual (Pugh) arising out of Pugh's sexual misconduct towards the plaintiff. 153 F. Supp. 3d at 973. The DPS defendants eventually settled with the plaintiff for $350,000, and a jury verdict was returned against Pugh in the amount of $250,000 for battery and intentional-infliction-of-emotional-distress (IIED) claims. *Id.* In concluding that the one-recovery rule did not require reducing the judgment against Pugh, the district court explained:

According to the amended complaint in this case, the plaintiff sought recovery from both Pugh and the DPS defendants on the [Michigan Elliott-Larsen Civil Rights Act (ELCRA)] claim for "emotional, psychological, and physical injuries, and the permanent and serious impairment of plaintiff's academic and social development." On the Title IX claim against the DPS only, the plaintiff's damages claim was based on "physical injuries, mental and emotional distress, pain, grief and anguish, medical expenses and the loss of earning capacity, all past, present, and future." He also sought damages against Pugh alone on the battery claim for "emotional, psychological, and physical injuries, and the permanent and serious impairment of plaintiff's academic and social development" and on the IIED claim for "severe emotional distress to plaintiff." There is considerable overlap in the nature of the damages requested against the DPS defendants and against Pugh in the amended complaint. However, those damages are not identical.

The settlement with the DPS defendants, as described on the record, was meant to cover the plaintiff's claim for damages—which included loss of earning capacity—plus attorney's fees, for which the DPS defendants could be liable under Title IX, see 42 U.S.C. § 1998(b), and ELCRA, see Mich. Comp. Laws § 37.2802. The jury verdict addressed only the plaintiff's damages for emotional distress or emotional suffering, which was limited by the jury instructions to "mental anguish[ ] and ...embarrassment, humiliation, or mortification." Because the jury returned a verdict in Pugh's favor on the ELCRA claim, the plaintiff cannot recover attorney's fees against him. There was no economic component in the verdict, such as the loss of earning capacity, which was included in the settlement with the DPS defendants. It can fairly be said that the DPS defendants' settlement was meant to compensate the plaintiff for a certain measure of emotional suffering. But despite some overlap, there is a distinct identity in the damages awarded by the jury and the amount to be paid by the school district. Therefore, requiring defendant Pugh to pay the full judgment would not offend the one recovery rule.

*Id.* at 981-82.

Unlike in *K.S.*, where the DPS defendants' settlement was intended to compensate for additional damages (earning capacity and attorney's fees) that the verdict against Pugh did not include, it is not apparent here whether there is any distinction in damages between the claims against Hemady and Singhal. As stated in Simon's motion, the claims against Hemady "relat[e] to the creation of [AMEG] to administer a program originated by Hemady between the Debtor and a medical school which provided students to the clinical rotation program of the Debtor." Dist. Ct. R. 16-2, PID 186. Singhal's liability for conversion likewise relates to the creation of AMEG

to administer the Ross medical-student-training program and the diversion of funds from the Hospital to AMEG.

Finally, Simon's argument that Singhal is not entitled to a reduction in damages because he never filed a third-party complaint against Hemady is unavailing. He cites no authority for the proposition that a non-settling tortfeasor must implead another tortfeasor where that other tortfeasor already settled the relevant claims with the plaintiff. Further, *Grace*, like the present case, also involved a limitation on damages based on a prior settlement. 655 N.W.2d at 600, 603. There is no suggestion in *Grace* that the settling attorney was ever joined in the plaintiff's later proceeding against her husband, but the court nevertheless subtracted the prior settlement amount in determining damages because "plaintiff has sought to recover damages for an injury identical in nature, time, and place against both defendant and her divorce attorney." *Id.* at 603.

Accordingly, we vacate the district court's setoff determination. If Singhal is found liable for conversion of the Ross funds, this question should be reconsidered after additional evidence is presented.

## III.

For the reasons set out above, we AFFIRM the district court's grant of summary judgment on the common-law conversion count as it pertains to the funds diverted to DHOM, REVERSE the district court's grant of summary judgment on the common-law conversion count as it pertains to the funds diverted to AMEG, VACATE the district court's setoff determination, and REMAND for further proceedings consistent with this opinion.